*14
 
 Mr. Justice CLIFFORD
 

 delivered the opinion of the court.
 

 These are appeals in admiralty from the District Court of the United States for the district of "Wisconsin.
 

 , Libels were filed in these cases at a special term of the District Court of the United States, begun and held at the city of . Milwaukie, on the . first Monday of November, 1855. They are drawn in the usual, form of libels
 
 in rem,
 
 and respectively allege a breach of contract of affreightment. Both suits grew; out of contracts'for the transportation of goods by the steam ' propeller Niagara,' on her last trip during the season of 18.54, , .from the port of Buffalo, in the State óf New York, to Chicago, in the State of Illinois., They were argued.together iff this 'court, and it'was conceded at the argument, by the counsel on '. both sides; that they depended substantially upon the same state of-facts. All the testimony respecting the liability of the steamer was first taken and .filed in the case last named, and was subsequently admitted and read in evidence at the hearing ' .in .the other .suit, under a stipulation of the parties, and the ' pleadings are substantially thé saíne in .both cases.. On the part of the libellants, it is alleged, among other things, to the effect that on or about the twenty-eighth day of November, 1854, the libellants caused certain goods, particularly described in the respective libels, to be shipped in good order and condition on board the propeller Niagara; to be transported from Buffalo to Milwaukie, in the State of Wisconsin; and that the master, -Hugh Malion; received the goods on board, and in. .consideration of certain-freight, to be paid in that behalf by the respective libellants, undertook and promised to convey the goods from the port of shipment to the port of destination, and there to deliver |he goods, (the dangers of navigation, fire, and collision, only excepted,) in like good order and condition to the libellants or their respective agents.'
 

 And they further allege that the steamer .shortly thereafter departed on her voyage, bnt that the master, not régarding his duty,' nor his promise and undertaking, did not so convey the ' goods," although no danger of navigation,, fire; or collision, prevented him from so doing, and that the goods, or a large portion of them; through the mere carelessness, negligence, and
 
 *15
 
 improper conduct, of-the master, his mariners, or servants, became wetted, heated, or stained, and greatly damaged, or wholly lost to the libellants. Answers in the usual form of pleading were duly filed in each case on the twenty-fourth day of May, 1855, admitting the jurisdiction Of the court, and setting up substantially the same grounds of defence. They are alike in . all their material allegations, so far, at least,, as respects the questions discussed at the bar, and all the matters involved in the judgment of the court. In both cases the answers admit the contract to transport the goods, as per bill- of lading, the dangers of navigation, fire, and collision, excepted; and that certain packages, under each, of the contracts, were accordingly shipped on board the, steamer for that trip, leaving it to the libellants in each case to make such proof of the kind, quantity, and value of the goods, as-they might be advised was material, and aver .that the steamer, when she departed on the voyage, on the' twenty-ninth day of November, 1854, was tight, stanch, seaworthy, and well manned, and that her entire cargo was well, safely, and securely stowed. And the respondents, denying every allegation in the libels, of carelessness, negligence, and improper conduct, on the part of the master and his mariners, aver the fact to be that they were vigilant, competent, and skilful in the premises, and did what it was their duty to do under the circumstance's, in which they were placed. They admit, also, that a part of the cargo was damaged, but allege and insist that the damage was occasioned by a danger of navigation within the exception of the bill of lading, for which they are not, and ought not, in any manner to be held responsiblé. And they further allege that the steamer was; by stress of weather, compelled to make the harbor of Presque Isle, and by the snow and the force of the storm and' wind, which was very severe, the steamer dragged her anchor, went ashore, and was dashed upon the beach, from which cause, and the necessary, detention of the goods on board, thé damage, whatever it is,, occurred; and that in the month of May, 1855, which was as soon thereafter as it was possible to repair the steamer and for her to proceed on her voyage, the goods, or so much'of them as belonged to the respective libellants, were..
 
 *16
 
 transported to Milwaukie, and there delivered to them, and were by them respectively received, with a full knowledge of the damage, if any,, and of its cause, and with an agreement not only to share the damage, but that the goods should be charged with and pay their proportion of a general average of the losses thus occasioned; and the respondents claim that the libellants, in each case, are liable “ for a large amount of the average and damage” to the steamer, which they aver to be the sum of two thousand dollars.
 

 This statement from the libels and answers embraces the substance of the' pleadings in both cases, so far as respects the several matters discussed at the bar, and the real merits of the controversy. Testimony was taken on both sides in the court below, and after a full hearing a decree in each case was en- ■ tered for the libellants, and the respondents appealed to this court. No additional testimony has been taken since the appeal, and it seems to be conceded that the i’ights of the pair ties depend- chiefly upon certain questions of fact to be determined from the evidence, which is conflicting, and in some particulars very contradictory. That remark, however, applies more particularly to -that part of the testimony which relates to the conduct, of the master after the steamer was stranded, and the means at his command to secure and preserve the goods' from damage. Many' of the- facts and' circumstances connected with the voyage, as well as those attending the disaster, are involved in much less difficulty, and some of those most material to be ascertained are satisfactorily proved, with- - ■ out any contradiction w’hatever. On the one side, no question is made that the goods were regularly shipped at Buffalo on the twenty-eighth day of November, 1854; and on the other, it is admitted that in the contract of shipment the dangers of ' navigatihn, fire, and collision, were duly excepted in the usual form of such an exception in bills of lading. All of the goods were shipped in. good order and condition, and were to be delivered at Milwaukie, as alleged by the libellants. They consisted in the one case , of groceries, and in the other of dry goods; and it is conceded.that they were carefully and properly stowed. On the day following the shipment^the Niagara
 
 *17
 
 left Buffalo, and proceeded on her intended voyage. She was a steam propeller, of four hundred and fifty tons burden, and ■ at the time of her departure was a good, tight, stanch vessel, every way suitable for the navigation in which she was engaged, and was well furnished with ground tackle, including two anchors and two chains. One of her anchors weighed fourteen hundred pounds, with an inch and an eighth chain of. sixty fathoms, and the other weighed seven hundred pounds, with a chain of the usual size and length. Her whole company consisted of twenty-two men, constituting a full complement of officers and crew for the voyage in a steamer of that description. Having proceeded on the usugl route for that voyage, she arrived in Lake Huron on the second day of December, at four o’clock in the morning, in perfect safety, and crossed Saginaw bay in the afternoon of the. same day. About eight o’clock in the evening of that day, it commenced snowing, with a light wind, which by twelve o’clock at' night freshened to a gale, and the storm continued without any abatement* blowing a heavy gale from a northeasterly direction, of east-northeast, till the day after the steamer was stranded.
 

 • After crossing Saginaw bay, however, she continued, on.her regular course, and made Thunder-bay light at one o’clock, and proceeding onward on her voyage, arrived off Presque Isle, and made the light at that place at four o’clock in the morning, without having suffered any damage or met with any. difficulty except that the master testifies- that she rolled heavily, and that for a half or three-quartei’s of an hour before he made th'e light, he had to keep her off her course two points, to ease her in the sea. Her course-from Thunder bay had been north-northwest for a short time', then west by north, and then northwest; and the mate of the steamer testifies, that when they first saw Presque Isle light, the steamer was a mile or two east o± the light, and was in the usual course. ■ At t^iat time she was in no want either of wood or water, and it does not appear that she was in any worse condition to proceed on the voyage, unless prevented by the,storm, than at the moment when she left the place of her departure. Her cargo was a general assortment of merchandise, consisting of teas, sugars, coffee, fish,
 
 *18
 
 liquors, molasses, crates of crockery, bales of sheeting, boxes-of dry goods,' and various other articles, specified in the record. All of the liquors, molasses, aud some of the boxes, were stowed on the ground-tier in the lower hoid. Heavy goods wei’e placed at the bottom, and light' goods on top, and the hold was full, and battened down. Most of the light goods, such as boxes of merchandise,’ teas, sugar in barrels, and bales of sheeting, were on-deck, and there were some willow wagons on the hurricane deck. None of her deck load had been washed away or injured, and it does not appear that it had been in any manner displaced or thrown into disorder by the rolling of the vessel.
 

 These considerations tend strongly to show that there could not have been any urgent necessity to change the course' of the steamer on account of the violence of the storm or the motion of the vessel, and, consequently, affect the credit of the master, and.corroborate the statement of the mate, that, at the time the light was discovered, the steamer was pursuing her usual route. Both the master and the mate were on deck when they made the light, and the master gave the order to run into Presque Isle, In entering the harbor, they steered west-southwest, and then doubled inside of a small shoal round to the southeast, in order to get to the pier. What purpose was to be accomplished by getting to the pier, it is not easy to perceive, as the mate testifies that they knew that the sea was so heavy that the steamer could not lie at the dock.- They, however, came round to the southeast, and so near to the pier that tfie mate says he . could seethe snow on the beach, and then let go the large anchor, and the wind immediately caught the steamer on '■the larboard bow, and- she commenced dragging the anchor. When they found that the steamer dragged, and that there was danger ..that she would, go ashore, instead of casting the other anchor, their first endeavor was. to get rid of the one already • cast, in order,, if possible, to work her off, and make another effort to get up to the dock; and, finding that they'could not heave the chain w‘th the windlass, then ..ext'effort was to slip it; and while they were endeavoring to unshackle the chain the steamer struck, and went on to the beaSh stern firs^'-and
 
 *19
 
 immediately swung round broadside to the shore. No attempt was made to. let go the small anchor, although it was hanging at the bow, and the mate admits that the steamer dragged more than a quarter of a mile' before she struck. They presently tried the pumps, and it was found .that she did not leak. Shortly after, she commenced pounding, arid it was then ascertained that she was making water freely, when they started the engine-pump,- hut it choked with sand, and they were obliged to desist.. ’'At the place where the steamer lay the water was seven or eight feet deep, and she filled to the level of the water outside in two or three hours, so that the water in the hold 'was four or five feet deep above the top of the keel-son. It was about five o’ciock in the morriing of the third of December, 1854, that the steamer went on to the beach, and the master and all hands remained on board till ten. o’clock in the forenoon, when he and the mate went on shore for the purpose, as he testifies, of ascertaining whether, there were any facilities for storing the goods, and whether it would be possible to unload the steamer, and get her off. "When he got on shore, he found the steamer Plymouth, bound down the lake, lying there, fastened at the dock; she- having touched at Presque-Isle for wood four or five hours before the arrival of the Niagara,,and remaining there on account of the storm. Having made certain inquiries of the residents, and consulted with the master of the Plymouth, he came to the conclusion that it was the safest way to leave the goods on board, as more of them, in his judgment, would be protected in that mode than .by removing them on shore; and on. the morning of the sixth of December, the master, other officers, and all the crew. of the Niagara, except three, took passage in the Plymouth, leaving the watchman, wheelsman, and porter, in. charge of the steamer, with the hatches fastened down, and the goods in the condition in which they were when the steamer was stranded. During the night of the fourth of December, the storm subsided ; but the following day was very cold, so that the steamers were frozen in, and persons walked on the ice from the pier.-to the place were the Niagara lay, which was more than a half mil? It moderated, however, during the night, and on
 
 *20
 
 the following morning'the ice went out of the harbor, and two other steamers, the Republic and Kentucky, came in before ' the Plymouth left, and the former took the place of the Plymouth at the dock after she started on her voyage down the lake. Several witnesses testify — and among the number the master of the Plymouth — that the sixth of December, the day he left, was a fine day, although, he says, there was so much ice about his boat, where she lay at the dock, that he had to cut her out in the morning before he started. -
 

 One of the witnesses for the libellants, who resides at Presque Isle, testifies, that after the Plymouth left, it was cleaiy and made ice, but did not blow, aud that not long after there was a thaw, which continued till the thirteenth of January, and that after the thaw thei’e were two or three weeks of very nice weather. Navigation, however, closed in a few days after the Plymouth left, and the Niagara remained on the beach, -where she was stranded, until the mate, who is now the master of the Niagara, returned to. Presque Isle, on the twenty-seventh day of April, 1855. "When he returned, he found her where he left her, in charge of the watchman. He immediately pumped her out with a steam-pump, according to his account, and lightened her oft’ with a steamboat, and, after she was lightened, got the steamboat to take her up to the dock, where he removed the residue of the goods, and then took her to Detroit and had her repaired. After she was repaired, he re- ■ turned to Presque Isle, in the month of May, 1855, and conveyed the goods, or so much of them as had not been destroyed, to the place of destination. Some of the goods were in good condition or were slightly injured', while others were greatly damaged or wholly, worthless. Those stowed below had remained entirely without ventilatioii from December to March, and then the hatch at midships only had been opened. They * were heated, discolored, and stained, and one of the witnesses testifies that sugar, coffee, and dried fruit, wei’e all soaked together,'and that the water pumped up was dark, exhibiting the appearance of. the soakings of coffee and codfish, and that the goods had the offensive smell of dead water. They were taken out about the first of May, so that those stowed in the
 
 *21
 
 lower hold, hot more than four or five feet above the keelson, had been submerged in bilge-water for nearly five moiiths, and’ ■ some of those above, the water had been moistehed.by the dampness and become, mouldy. Damages to the amount of laree thousand seven hundred and, sixty-three dollars and seventy-six cents wer,é' allowed b'y ijhe^ district judge, in the case • first named, and in the/other, four th'dusand nine hundred and sixty-four .dollars and thirty cents, and it is.not pretended in the argument that the respective amounts were either extrava-. gant or unreasonable.' It is net upon any.such ground that the appellants seek to reverse the respective decrees’ in the court below.' They deny that they are. liable at all for any amount, and set up’ the ’first exception in the contract of shipment or bill of lading, and their counsel insist upon the following propositions:'
 

 I. That the damage to the goods resulting from the strand^ ing of the steamer was wholly occasioned by the dangers of navigation, the risk of which was not taken by the master or' owners of the steamer.
 

 II. That after the Niagara was stranded and filled with, water, and disabled from proceeding on her voyage, the appellants, were responsible only for the ultimate delivery of the goods, and for reasonable care in .preserving them from the effect of storms, bad air, leakage, and embezzlement.
 

 III. That the master, after the steamer was-stranded, and the goods wetted, became and was the agent of the-shippers of the goods as well as of the owners of the vessel, and as such, uñder the circumstances of this case, is responsible only for due and proper care and diligence, and that it cannot be successfully contended, from the evidence, that such care and diligence were not exercised.
 

 These propositions, whether taken separately or collectively, necessarily involve mixed questions of law and fact, which in ' a case like the present must be determined by the court, acting instead of a jury, to find the facts, and as a court to determine the law. Such propositions, therefore, must he considered in connection with all the legal evidence exhibited in the re_cord, and their accuracy must be tested by the true state of
 
 *22
 
 the facts as found by the court from the evidence, and by the rules of law applicable to that state of the case. According to the admitted or undisputed facts of the case, the Niagara was enrolled and licensed for the coasting trade, and was employed by the owners in transporting goods, under contracts for freight, upon navigable waters-between ports and places in different States, and at the time of the disaster she had a full cargo of merchandise, of various descriptions, on board, consigned to merchants or parties residing either at her port of destination or at Milwaukie, and other intermediate ports or places along the course of her voyage. She was a general ship, laden with goods to be transported for hire; and the goods in question having been received and taken charge of, as goods under a contract of shipment, corresponding in terms to the usual bill of lading for the transportation of goods on inland navigable waters, the question of liability in this case must be determined by the rules of law applicable to carriers of goods upon such inland waters. A common carrier is one who undertakes for hire to transport the goods of those who may choose to employ him from place to place. He is, in general, bound to take' the goods of all who offer, unless his complement for the trip is full, or the goods be of such a kind as to- be liable to extraordinary danger, or such as he is unaccustomed to convey. Tn all cases where there is no special agreement to the contrary, he is entitled to. demand the price of carriage before he receives the goods; and if not paid, he may refuse to receive .them; but if he take charge of them for transportation, the non-payment of the price of carriage in advance will not discharge, affect, or lessen his liability as a carrier in the case, and he may after-wards recover the price of the service performed. When he receives the goods, it is his duty to take all possible care of them in their passage, make due transport and safe and right delivery of them at the time agreed upon; or, in the absence of any stipulation in that behalf, within a reasonable time. Common-carriers are usually described as of two kinds, namely, carriers by land and carriers by water. At common law, a carrier by land is in the nature of an insurer, and is bound to keep and carry the goods intrusted to his care safely, and is liable for all
 
 *23
 
 losses, and in all events, unless lie can prove that the loss happened from the act of God, or the public enemy, or by the act of the owner of the goods.
 

 Common carriers by water, like common carriers by land, in the absence of any legislative provisions prescribing a different rule, are also, in general, insurers, and liable in all events, and for every loss or damage, however occasioned, unless it happened b,y the act of God, or the public enemy, or by some other cause or accident, without any fault or negligence on the part of the carrier, and expressly excepted in the bill of lading. A carrier’s first duty, and one that is implied by law, when he is engaged in transporting goods by water, is to provide a seaworthy vessel, tight and stanch, and well furnished with suitable tackle, sails, or motive power, as the case may be, and furniture necessary for the voyage. She must also be provided with a crew, adequate in number and sufficient and competent ■for the voyage, with reference to its length and other particulars, and with a competent and skilful master, of sound judg-' ment and discretion; and, in general, especially in steamships and vessels of the larger size, with some person of sufficient ability and experience to supply his place temporarily, at least, in. ease of his sickness or physical disqualification. Owners must see to.it that the master is qualified for his . situation” as • they are, in general, in respect-tó goods transported for hire, responsible for his acts and negligence. . He must take care to stow and arrange the cargo, so that the different goods may not be injured by each other, or by the motion of the vessel, or its leákage; unless, by agreement, this duty is to be performed by persons employed by the shipper. In the absence of any special agreement, his duty extends to all that relates to the lading, as well as the transportation and delivery of the goods; and for the faithful performance of those duties the ship is liable, as well as the master and owners. A clean bill of lading, in general, imports, unless the contrary appear on its face, that the goods are to be safely and properly secured under deck. (Eland, on Ship., see. 192.)
 

 In the case of a parol shipment, the master is allowed to show a local custom to carry the goods on deck in a particular trade.
 
 *24
 
 It m ust, -however, be a custopi so generally known and'recogr nised, that a fair presumption arises that the parties in .entering into, the contract agreed that their rights and duties should be regulated by it. Having received the goods for transportation, in the absence of any stipulation as to the period 'of sailing, the master must commence the voyage within a reasonable time, without delay, and as soon as ■ the wind, weather, and tide,'will permit. After haying set sail, he must proceed on the voyage, in the direct, shortest,.and usual route, to the port of delivery, without unnecessary deviation, unless there has been an express contract as .to the course to be pursued; and where the vessel is destined for several ports-and places, the master should proceed to them in th'e order in which they are. usually visited, or that designed by the .contract, or, in certain cases, by the advertisement rélating to the particular voyage. A deviation from the direct route- may be' excusable "if rendered necessary .to execute repairs for t-lxe preservation-of the ship, or the prosecution of the.voyage, or to avoid a storm,' or an enemy, or. pirates, or. for-the purpose of obtaining neces-sary supplies of water and provisions, or, in the case of a steamer, to obtain necessary supplies of wood or-coal for the prosecution of the voyage, or for the purpose of assisting another vessel in distress.
 

 As agent of the owner, the master is bound to carry the goods to their place of destination in his own ship, unless he is prevented from so doing by some cause arising from irresistible force, over which he has no control, and which cannot be guarded against by the watchful exertions jh human skill and prudence. When the vessel is wrecked or otherwise disabled in the course of the voyage, and cannot.be repaired without too great delay and expense, he is at liberty to tranship the goods and send them for ward, so as to earn the whole freight; and if another vessel can be had in the same or a contiguous port, or at one, within a reasonable distance, it becomes his duty under such circumstances.to procure it and transport the goods to their place of destination, ¡and in that event he is en titled to charge the goods with the increased freight arising from the hire of the vessel sq procured. That rule, however,.
 
 *25
 
 is not obligatory in cases where the goods are not perishable, provided the ship can be repaired in a reasonable time. In that state of the case he may, if he deems it best, retain the goods until the repairs are made, and forward them in his own vessel; and upon the same principle, and for the same end, if he have' no means to tranship the goods, it is his duty to repair his own vessel, when, capable of being repaired, provided it can be done within a reasonable time, and he has the méans at his command; and if not, and the means cannot be obtained from the owner, or upon the security of the ship, he may sell a part, or hypothecate the whole, and apply the proceeds to execute the repairs, in order that he may be enabled to resume the voyage and carry, the goods, or the residue, as the case may be, to the place of destination; and he is not entitled to recover for freight if he refuses to tranship the goods, unless he repairs . his own vessel within a reasonable time, and carries them on - to the place of delivery. Most of the rules of law prescribing the duties of a carrier for hire, and regulating the manner of their exercise, have existed for centuries, and they cannot be modified or relaxed except by the interposition of the legislative power of the Constitution. Time and experience have shown their value and demonstrated their utility and justice, and they ought not and cannot be changed by thejudieiaiy. Some new and important provisions have been introduced into the law of carriers by water, by the act of the third of March, 1851, entitled “An act to limit the liability of ship-owners.” Owners of ships under that act are not held liable for loss' or damage to the cargo by reason of fire happening to or on board the vessel, unless the fire was caused by the design or neglect of such owner, except in cases where there is a special contract between the owner and the shipper, whereby the former assumes that risk. They are declared not liable .as carriers for precious metals, precious stones, or jewels, or for the bills of any bank or public body, unless at the time of their. lading a note in writing of their trué character and value be given to the owner or his agent, and the same be entered on the bill of lading; and in no case where that act applies will the owner be liable for the articles therein enumerated beyond the amount
 
 *26
 
 so notified and entered. It contains other provisions also of very great practical importance, and among. the number the following: That for embezzlement, loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture done, occasioned, or incurred, without the privity or knowledge of the owner, his liability shall in no case exceed the amount or value of his interest in the vessel and the freight then pending. No part of the act, however, applies to the owner of any canal boat, barge, or lighter, or to any vessel of any description whatsoever used in rivers or inland navigation.
 

 A question'may.arise, whether the lakes bordering on a foreign j urisdiction are or are .not excluded from the operation of the act finder the term inland navigation; but it is not necessary at the present time to determine or consider that.qnestion, as the first exception in the contract of shipment is the only one set up in this case, and there is no pretence that there has been any transfer of the steamer under the fourth section of '"the act for the benefit of the libellants.
 

 Carriers by water are liable at common law, and independently of any statutory provision, for losses arising from the acts or negligence of others, to the same extent and upon the sanie principles as carriers by land — that is to say, they are in the nature of jnsurers, and are liable, as before remarked, in’ all events, and for any loss, however sustained, unless it happen from the act of God, or the public enemy, or by the act of the shipper, or from some other cause or accident expressly excepted in the bill of lading. Duties remain to 'be perfox-med by the ownei', or the master as the agent of the owner, after the vessel is wrecked or disabled, and after he has ascertained that he can. neither procure another vessel nor repair his own, axid those, too, of a- very important character, arising immediately out of his original undertaking to carry the goods safely to their place of destination. His obligation to take All possible care of the goods still continues, and is by no means discharged or lessened, while it appears that the goods have not perished with the wreck, and certainly not where, as in this ease, the vessel is only stranded on the beach. Such disasters are of frequent occurrence alpng the seacoast in certain seasons
 
 *27
 

 '
 
 of tlie year, ass well as on the lakes, and it cannot for a moment he admitted that the duties and liabilities of a carrier or master . are varied, or in any manner lessened, by the happening of such an event. Safé custody is as much the duty of a carrier as conveyance.and delivery; and when he is unable to carry the goods forward to their .place of'destination, from causes which he did not produce, and over which hé has no control, as by the stranding of the vessel, he is still bound by the original obligation to take all possible care of the goods, and is responsible for every loss or injury which might have been prevented by human foresight, skill, and prudencé. An effort was made . by able counsel, in King
 
 v.
 
 Shepherd, (3 Story C. C., 358,) to maintain the proposition, assumed by the respondents in this case, that tlie duties of a carrier after the ship was wrecked or stranded were varied, and therefore that he was exempted from •all liability, except for reasonable diligence and care in his endeavors to save the property. Judge Story refused to sanction the doctrine, and held that his obligations, liabilities, and duties, as a common carrier, still continued, and..tbat he. was. bound to show that no human diligence, skill, or care, could save the property from being lost by the disaster. Anything • short of that requirement would be inconsistent with the nature of the' original undertaking, and the- meaning of the contract, as universally understood in courts of justice. Admit the proposition, and it is no longer true that, where there is no provision in the contract of affreightment- varying the liability of the carrier, he cannot relieve himself from liability for injuries to goods intrusted to his care, except by proving, that it -was the result of some natural and inevitable necessity superior to all human agency, or of a force exerted by a public enemy. Kent, Chief Justice, said, in Elliott
 
 v.
 
 Russell, (10 Johns., 7,) decided in 1813, that it has long been settled that a common carrier warrants the delivery of the goods in all but the excepted cases of the act of God and public enemies, and there is no distinction between a carrier by land and a carrier by water; and the same learned judge also held that the chaiij acter, duty, and responsibility of a carrier continues to. attach", to a master as long as he has charge of the goods. . A idaster,
 
 *28
 
 says a learned commentator, should always bear in mind that it is his duty to convey the cargo to its place of destination. This is the purpose for which he has been intrusted with it, and this purpose he is bound to accomplish by every reasonable and practicable method. Every act that is not properly and strictly in furtherance of this duty is an act for which both he aud his owners may be made responsible. His duties as carrier are not ended until the goods are delivered at their place of destination, or are returned to the possession of the shipper, or kept safely .until the shipper can resume their, possession, or they are otherwise disposed of according to law. (King
 
 v.
 
 Shepherd, 3 Story C. C., 349; Abbot on Ship., 8th ed. Perk., 478.) These authorities are sufficient, it is believed, to demonstrate the proposition, that where a loss or damage is shown, it is incumbent upon the carrier to bring it within the excepted peril in order to discharge himself from responsibility. It is not sufficient, without more, to show that the vessel was stranded, to bring the goods within the exception setup in this case. Had the goods perished with the'wreck, it would be clear that the loss was the immediate consequence of the stranding of the vessel; and assuming that the disaster to the vessel was the result of the excepted peril, or of some' natural and inevitable accident, then the carrier would be discharged. All the evidence, however, in this case, shows the fact to be otherwise ; that the goods did not perish at the time the steamer was stranded; and the damage having since occurred, the rule of law to be ascertained is the one applicable in cases where the injury complained of arises subsequently to the disaster to the vessel. Such interruptions to a voyage are of frequent occurrence, and the rule of law is just and reasonable which holds that the master is bqund to the utmost exertions in his power to save the goods from the impending peril, as it is no more than a prudent man would do under like .circumstances. In great dangers great care is the ordinary care of prudent men, and in great emergencies prudent men employ their best exertions; so that the difference in the rule contended for, and the one here laid down, is much less' than at first appears. Nevertheless there is a difference, and in a question of so much
 
 *29
 
 practical importance it is necessary to adhere strictly to the correct rule. Losses arising from the dangers of navigation within the meaning of the exception set up in this case arc not such as are in any degree produced from the intervention of man. They are such as happen in spite of human exertions, and which cannot be prevented by human skill and prudence. "When such efforts fail to save the goods from the excepted peril, the ultimate loss and damage in judgment of law results from the first cause, upon the ground that when human exertions are insufficient to ward off" the consequences, the excepted peril may be regarded as continuing its operation. Such, it is believed, is the nature of the contract betwéen a carrier and ¡shipper, so far as it becomes necessary to examine it in the cases under consideration. Carriers' may be’ answerable for the goods, although no actual blameds imputed to them; .and-after the damage is established, the burden lies upon the respondents to show that it was occasioned by one of the perils from which they are exempted in the. contract of shipment or bill of lading. (Clark
 
 v.
 
 Barnwell, 12 How., 272; Rich
 
 v.
 
 Lambert, 12 How., 347; Chitt. on Carriers, 242; Story on Bail, secs. 528, 529; 3 Kent Com., 213; 1 Smith Lead. Cases, 313; Choteaux
 
 v.
 
 Leech et al., 18 Penn., 233; Fland. on Ship., sec. 257; Marvin on Wr. and Salv., 21; Parsons’s Mer. L., 348; Smith’s Mer. L., 3d ed., 386.)
 

 Applying these principles of law in the consideration of the case, we will proceed to a brief review of the evidence, in connection with that already given, bearing upon the questions of fact presented for decision. It has already appeared that the steamer made the light at Presque Isle on the third day of December, 1854, at four o’clock in the morning. At that time she was on the usual course, and was heading northwest. She had met with no difficulty up to that time, and was tight, stanch, and strong, and in no want either .of wood or water. Her master says, however, that he found it would be a great risk to haul her off to'get round’the point, doubtless referring to his previous statement that he had kept her off her course to ease her in the sea. She was then sailing northwest, and her course up to the straits would have been, as the witnesses
 
 *30
 
 say, either west-northwest, or, northwest by west half west, and there is no difference of .opinion among them that the course was direct and the wind was a fair wind for steamers; and one witness says that in a conversation with the mate, while he was at Presque Isle, he heard him say that they need, not have entered the harbor. All or nearly all the witnesses agree that there is no difficulty in entering that harbor ini the daytime, and that the anchorage, though rather limited in space, is safe and quite good just northwesterly of the end of the pier and out towards the light-house, and that the harbor affords a good shelter to vessels in a storm, except when the wind is blowing from a northeasterly direction or east-northeast, and then that its course is directly into the harbor, which fact must have been well known to the master and mate at the time they decided to make the attempt. Many of the witnesses say that it is more difficult to go in during the night, and several testify positively that it is dangerous, and some of the more ■ experienced navigators say they would not risk the attempt in ardark night. One witness, the master of the Plymouth, called by the respondents, testified that the steamer did not .come right in; that she broached to so near the mouth of the harbor, that she was detained at least a quarter of an hour. She, howevei', succeeded in entering the harbor, aud cast her anchor as before stated. Pour experienced navigators testify to the effect.that she should have kept on her course; that it was not proper to enter the harbor. Oh the other side, one witness , says, that whether it was good seamanship or not would depend upon the position of the vessel; and that if she was near in, he thinks it. was prudent, and that he should have entered. Another says that if he had considered either vessel or cargo • in danger, he should have gone in by all means; and the mate says that they concluded that it was better to go in. One witness, called by the libellants,, says he heard the mate say, after' the disaster, that it was unnecessary.
 

 These are the principal facts bearing upon the question, whether the master exercised a sound judgment and discretion in entering the harbor. Most of the facts in evidence respect- . ing the acts of the master after he entered the harbor, as they
 
 *31
 
 appear to the court, have already been stated, and need not be repeated. Experts were called and examined upon the question whether the master evinced proper skill and-judgment In the attempt he made to anchor, and on that point tnree or four witnesses, who are experienced navigators, were called and examined by ■ the libellants. They testify to the effect that a master of a steamer about to enter a harbor under the circumstances of this case ought to have both anchors ready, 'so that if one will not hold-the vessel, he can cast the other; and they express the opinion that such- precautionary steps are no more than ordinary prudence; and one of them says that it is customary to let go the small anchor first, and if th?.t.will not hold, then to let go the, large -anchor. On the other side, the mate of .the steamer testifies that they had not time to let go the small anchor; and another witness expresses the opinion, that if the'large anchor and the engine would not hold,'then-there was nothing that could be' done;. and the master of the Plymouth says that he knows of nothing else that could' have been done, except to cast the anchor.
 

 Numerous witnesses were examined on the question whether it was practicable to have removed the goods and stored them; and whether, if it had-been done, it would have afforded any better protection to the goods. On this point the testimony, of the witnesses is very conflicting. All that can be done is to state the principal facts, as they appear to the. court.
 

 Nineteen men were residing at Presque Isle at the time of the disaster, mostly temporary .residents,.'in the'employment of Frederick Barnham, a witness for the respondents.. There were four dwelling-houses there in which people lived, and two unoccupied, and there were two . barns and a vacant shop; all or nearly all' the dwellings were built of logs, and were rudely finished. .Three, of those dwellings were within a.half mile . of the place. where the steamer lay, which was within a quarter of-a mile of .a road extending round on the beách from the pier, where the Plymouth lay, with her officers'and crew' on board. Several days previously, the steamer Grand Turk had-been wrecked, twelve miles distant from Presque Isle, and her officers and crew were-there, consisting in all of
 
 *32
 
 eight or nine men. There was a large scow in the harbor, in good order, anchored near the pier, and not in use, which several witnesses testify might have been obtained to-lighten the steamer; and one witness testifies that the same scow was used by the mate in the spring following to carry the goods from the steamer t'o the dock, before "She was taken off by the tug. Nine pumps, such as are used on board vessels, and brought up to use on the other disabled steamer, were lying on the beach, within a half mile. All the witnesses agree that the Piaster of the Niagara never applied to any one of them for any assistance, either in respect to the goods or.the steamer; and the mate admits that they had made up their minds to leave, the evening of the day aftér the disaster. Some of the witnesses offered assistance, and it-was declined, Courtwright testifies that he heard a conversation between the master and the mate, in presence of fifteen or twenty persons, in reference to taking out the cargo of the steamer. The mate said to the master tfat they could get the goods out of the-steamer, and get her alongside of the dock; to;which the master replied, that it was too late-in the season to do anything with her; that he was'bound to go home; that-he.would not stop there for the steamer and all that was in her. Other declarations of the master, equally expressive of his determination to return honre, are also in evidence; and, being a"part of the
 
 res gestae,.
 
 are clearly admissible to explain the motives of the master, in connection with his- acts. Many witnesses on the side of the respondents expi-ess the opinion that the goods could not have been removed; andan equal'or greater number called by the libellants express a contrary-opinion, and suggest various modes '-by which it might have .been accomplished ■ in a very short time. Such opinions, however,,- cannot have .much weight in determining the question. One important fact is clearly proved, namely, that the ice went out"of the'harbor the night before the Plymouth left,- and it was mild weather after that; for the most part, till near ithe middle of January, 1855.
 

 Our conclusions upon these several questions., may be briefly, stated. In respect to .the one first presented, it is proper to remark that it depends upon the .proof whether the act of the
 
 *33
 
 master, in seeking shelter in the harbor,-was reasonably necessary; ancl if it was, then he is not in fault on that account. None of the circumstances exhibit such clear and decisive indications as would justify the conclusion that he did not think ' at the time that it was the most expedient course to be pursued. That he was without much experience as a master of a. steamer, of this description, does not seem to be denied; and it is equally clear that he had a strong preference for a sailing vessel, as is made evident by his own remarks, as well as in another fact proved in the case, that he has resumed his more favorite employment upon the water, for which, perhaps, he is better qualified than for the one in which he was then engaged. He says, in effect,-that he found it would be dangerous to proceed_on'the voyage, and the mate says they concluded that it would be better to go into Presque Isle; and on.their own opinions thus expressed, and the proofs as to the violence of the storm,' his vindication mainly rests. Strong doubts are entertained whether, he acted wisely.in departing from the. course of the voyage, and yet ‘the' evidence is not so full and clear in the case as to induce the court to place the -decision upon that ground. Whatever dangers there were iri entering the harbor, he succeeded in surmounting, and he cannot be held responsible for any accident which did not happen. Mas-1 ■'ters have a right, and oftentimes it is their duty, to seek shelter from a storm; and the fact that it would have been better to havé kept on the course, may be more app'arent now than it could have been to any one at the time. ' Something must be deferred to the judgment and discretion of the master-on-such occasions, so that although the circumstances tend strongly to prove that he misjudged, or was.wantin'g in that fearless, prudent energy which he- ought to have displayed, still they are not of that decisive character which incline the court to make the decision turn upon that ground ;■ and the same remarks 'also'apply to his acts, and endeavors to anchor the -steamer -' 'after he entered the harbor. Knowing,'as he did, that the “wind-was blowing, directly into the harbor, it is difficult-tb see ' why it was that he brought the steamer round to the positioni . - in the wind, so as to expose her to the' danger Which finally ’
 
 *34
 
 overcame his efforts to accomplish the purpose for which he says he sought the harbor. He'knew the course of the wind and the difficulties of the undertaking before he entered, and ought to have beeii prepared to encounter them with the best precautions in his power to make. When he found that the anchor dragged, a great majoi'ity of the witnesses say he ought to have let go the other. Ilis own description of what took •place on the deck of the steamer after she entered the harbor, as well as that given by the mate, evinces an- indecision and ■ want of energy quite unsuited to the emergency in which he was placed, and ténds strqngly'to show that he was wanting in the proper qualities of a skilful and well-instructed. master. These considerations create strong doubts in the -mind of the court, whether the respondents are faultless in this particular, and yet the court is disinclined to place the decision entirely on that ground, as several witnesses, of some nautical skill, haye testified that they are unable to see that anything more could have been done.
 

 • On the remaining ground of complaints against the master, we are all of the opinion that-he was guilty of gross negligence. His steamer lay. within ten or fifteen- rods of the beach, and within a little more than a half mile of the settlement, the number of whoseyesidents was temporarily augmented by the presence of the officers and crew of the steamer Plymouth and those of the Grand Turk; and yet all he did, so far-as appears, to secure or recover the large amount of property he had on ■ board, was to-go on shore, consult with one or more of the residents, advise with the master of the Plymouth, and then, came to the conclusion that nothing could be done, and that it was. best to leave-the goods'on board, tinder the charge of three of his' crew;. He remained, however, for two-.or three days, until the storm'had subsided-and the weather had moderated; and after two other steamers had arrived, in. the harbor, he took passage oh the Plymouth, and. returned-home, without',having made' any effort himself, or requested-the aid of others, either, to get off the steamer, orto remove and store the goods.
 
 We'
 
 áre satisfied from 'the evidence that the goods might have been removed- between'the time he left and the middle Of January,
 
 *35
 
 and we are not satisfied that it could not have been done or successfully commenced during the time he remained in Presque Isle. A removal of a part would have enabled him to protect the residue on board; and there is no sufficient ground from’ the evidence to conclude that he would have encountered any serious difficulty in finding places enough for storing to have enabled him to remove from the steamer all of that class of goods exposed to damage, and' store them on shore. At that time the goods had not received any considerable injury, and most of them, in all probability, none whatever. Prompt attention would have saved the property and protected the shipper from loss. It .must not be understood that a master can abandon his ship and cargo upon any such grounds as aré proved by the evidence in this casé, or, indeed, upon any other, so far as the goods are -concerned, when it is practicable for human exertions,, skill, and prudence, to save them from the impending peril.
 

 This view of the evidence renders it unnecessary to consider the other grounds of defence set up by the respondents.
 

 The decrees, therefore, of the District Court in the respective cases are affirmed, with costs, in each case for the libellants.