*G. F. Little* for garnishee.

---

# LAUPAHOEHOE SUGAR COMPANY *v.* WILDER STEAMSHIP COMPANY.

### EXCEPTIONS FROM CIRCUIT COURT, FIRST CIRCUIT.

SUBMITTED SEPTEMBER 20, 1897.    DECIDED JANUARY 7, 1898.

FREAR AND WHITING, JJ., AND E. P. DOLE, ESQ., OF THE BAR, IN PLACE OF JUDD, C.J. DISQUALIFIED.

In a case which turned on the question whether the loss of a vessel and its cargo occurred through negligence or through unavoidable casualty the court held the following questions to expert witnesses proper under the circumstances:

"How far do you consider the miscalculation of distance on the sea a danger of the sea or navigation, or a danger peculiar to the sea?"

"Is the danger of miscalculating distance at such a point as this Kokoiki point, under the circumstances in the supposed case, such as to have misled mariners of undisputed skill and experience?"

"With rocks projecting out from the land, submerged rocks projecting out from the land. Supposing the steamer Likelike to be approaching the coast of Hawaii at night on her way from the lower end of Maui to Kukaiau and heading towards the point known as Kokoiki, about a mile above Honoipu and about one-eighth of a mile above the Upolo point; that there was no moon and the sky was overcast; that the steamer was making about seven knots an hour under steam and sail with a fair trade wind breeze well to the north; that there was an unusually mild surf that night so that it could not be seen or heard in time to prevent the steamer from going too near the land; that the captain was in command watching for the land ahead, in his proper position, the outline

of the Kohala hills being in sight, and the captain misjudged his distance from land and went ashore on submerged rocks projecting off said point; that the captain came on deck and took command when the vessel was four or five miles off,—judged to be four miles off the land; Do you know of any precaution that he ought to have taken, or that—I will put it in this way: Do you know of any precaution that an ordinarily prudent and careful captain would have taken that he did not take in approaching the land?"

An instruction need not be given in the form requested if substantially given in another form.

## OPINION OF THE COURT BY FREAR, J.

This is an action of assumpsit to recover of defendant, a common carrier, $4,966.58 and interest, for the loss of plaintiff's goods shipped on defendant's steamer "Likelike" from Honolulu for Laupahoehoe, Hawaii, on the 19th of last April. The case was tried before a jury, which found for defendant, and is now brought here on plaintiff's exceptions to the admission, against plaintiff's objection, of certain testimony of expert witnesses and to the refusal of the presiding Judge to give to the jury an instruction requested by the plaintiff.

In the absence of a stipulation to the contrary, a common carrier is an insurer against the loss of goods he undertakes to carry, unless such loss occurs by act of God, or of the public enemy, or of the owner of the goods. But by stipulation he may be exempted from liability for loss from other causes, except his own or his servants' acts or negligence. In this case the defendant had thus been exempted by the express language of its shipping receipt, which was accepted by the plaintiff, against losses that might occur from various other causes, among which were "disasters or dangers of the sea," and "unavoidable casualty." The case turned on the question whether the loss was caused by a "danger of the sea" or "unavoidable casualty," or through negligence principally on the part of the Captain and First Officer of the steamer.

The loss of the goods occurred through the loss of the steamer, which ran upon submerged rocks off Kokoiki point, a little above

Upolo point, on the coast of Kohala, Hawaii, and became a total wreck. The steamer at the time was making the run from the leeward side of Maui across the Hawaii channel to the windward side of Hawaii. It is customary in making this run, not to head directly for the windward side of Hawaii, but to make for the coast of Kohala and then when near the coast to alter the course and run up along the coast. The object is to avoid head winds and waves. On this occasion the channel had been crossed and the steamer was in the act of turning to run up the coast when she struck. This was at night. The sky was somewhat overcast; some stars were visible but there was no moon. The wind was light, and the sea comparatively calm. The land for which the steamer had been heading was high inland but sloped towards the shore.

The defense was that the Captain miscalculated the distance of the steamer from the shore; that the calculation of distance at sea is peculiarly difficult, and especially under the circumstances of this case; that such calculation is a matter of judgment as well as of eye sight; that competent captains are likely to be deceived and to miscalculate distances under circumstances similar to those involved in this case, even when exercising proper care and prudence; that the Captain in command in this instance was competent; and that he was misled by appearances and through no want of proper care on his part.

The defendant introduced a number of expert witnesses, sea captains of long experience both elsewhere and about these islands, and familiar with the sea and coast in question, several of whom had commanded the steamer in question. One of these witnesses was asked, "How far do you consider the miscalculation of distance on the sea a danger of the sea or navigation, or a danger peculiar to the sea? To this question objection was made on the ground that to allow the witness to answer it would be to allow him to usurp the functions of the jury. This objection seems to have been based either on the theory that the witness was called upon to say whether miscalculation of distance at sea is a "peril" or "danger of the sea" under all circumstances as

matter of law, or else on the theory that the witness was asked to say whether the miscalculation in question under the particular circumstances of this case was a "danger of the sea," so as to constitute a good defense. It is evident from the explanation made at the time by counsel who asked the question as well as by the subsequent examination of the witness that the question was not asked for either of these purposes. The words "danger of the sea" were not used in a technical sense in the question. The object was to show that the difficulty of calculating distance is in general and as matter of fact much greater at sea than upon land. This was a point upon which those who have had experience upon the sea are peculiarly competent to judge. The object was not to show that in the opinion of the witness the loss occurred from one of the causes excepted in the shipping receipt, but to show a certain fact within the witness' knowledge as an expert which would tend to show with other facts that the loss did not occur through the negligence of the Captain or might have occurred without negligence on his ·part. The question, so understood, as it evidently was by the court and must have been by the jury, was within the class of questions that may be asked of expert witnesses.

Another question asked the same witness was this: "Is the danger of miscalculating distance at such a point as this Kokoiki point, under the circumstances in the supposed case, such as to have misled mariners of undisputed skill and experience?" Objection was made to this question on the ground that it was too vague. In the first place counsel contends that it was vague in the use of the words "under the circumstances of the supposed case." He contends that many hypothetical instances had been mentioned and that it was impossible to say which were and which were not meant. We find that only one hypothetical case had been put and that had been stated twice to this witness shortly before the question was put to him. It was unnecessary to repeat it again so soon. There could have been no misunderstanding on this point. It is contended, secondly, that the words "such as to have misled mariners of undisputed skill

and experience" are vague in that they may mean "such as *might* have misled" or "such as *would* have misled." The question was evidently intended and understood in the former sense. That is the more natural of these constructions, and in meeting the objection counsel explained that the question was of the character of the following question which had already been asked without objection, namely, "Is the fact that a captain has misjudged his distance from land at sea necessarily proof of negligence?" I! is further contended that, construed in this sense, the question was improper on the ground that to allow it would be to allow the witness to usurp the functions of the jury. The trial judge sustained all objections to questions which called for an opinion upon the conflicting evidence in the case or upon the general merits of the case. He allowed the witness in question to state whether in his opinion, as an expert, upon certain facts stated hypothetically and which there was evidence to support, the difficulty in calculating distance from the land was such that a competent captain exercising proper care, might have been deceived. In *McArthur v. Sears*, 21 Wend. 190, cited by plaintiff's counsel, the master of the steamboat had mistaken a light upon a stranded vessel for a light usually exhibited by the keeper of a beacon light, in consequence whereof the steamboat was stranded and the goods jettisoned. Evidence was introduced, as in the present case, to prove that the master was competent and that the most prudent master might have run his boat ashore under the circumstances. The Supreme Court said that the evidence strongly tended to free the master from all charge of neglect and that so far it was material, if the loss had depended wholly on natural causes, but held that the evidence was inadmissible because there was such an admixture of human means as to vitiate the defense that the accident occurred by act of God, and there was no exception of "dangers of navigation," &c., in the bill of lading. In other words the defendant stood chargeable at common law without qualification, and the court held the evidence inadmissible on that ground but apparently thought it would have been admissible if there had been an ex-

ception in the bill of lading, as in the present case. In *The Juniata Paton*, 1 Biss. 15, the master mistook a light on shore for the pier-light and, as in the present case, did not discover his mistake until just before the vessel struck. The bill of lading contained the words "dangers of navigation excepted" and the court distinguished the case from *McArthur v. Sears, supra*, on that account. In *Western Ins. Co. v. Toban*, 32 Oh. St. 77, in which a steamboat was lost on the river, having suddenly sprung a leak from an unknown cause, it was held proper to ask expert witnesses, "whether good, seaworthy steamers, properly laden, do or do not sometimes receive serious injuries to their hulls, which are not known at the time to be such by the officers and crew, and which do not for some reason at once fully develop themselves, but which finally cause them to leak seriously, and to sink unless the leak can be controlled by the pumps or found and stopped." Further comment upon this question will be unnecessary in view of what we shall say upon the next question.

The following question was put to another expert witness: "With rocks projecting out from the land, submerged rocks projecting out from the land. Supposing the steamer Likelike to be approaching the coast of Hawaii at night on her way from the lower end of Maui to Kukaiau and heading towards the point known as Kokoiki, about a mile above Honoipu and about one-eighth of a mile above the Upolo point; that there was no moon and the sky was overcast; that the steamer was making about seven knots an hour under steam and sail with a fair trade wind breeze well to the north; that there was an unusually mild surf that night so that it could not be seen or heard in time to prevent the steamer from going too near the land; that the Captain was in command watching for the land ahead, in his proper position, the outline of the Kohala hills being in sight, and the Captain misjudged his distance from land and went ashore on submerged rocks projecting off said point; that the captain came on deck and took command when the vessel was four or five miles off,—judged to be four or five miles off the land; do you know of

any precaution that he ought to have taken that he did not take; do you know of any precaution that he ought to have taken, or that—I will put it this way: Do you know of any precaution that an ordinarily prudent and careful captain would have taken that he did not take in approaching the land?"

It is urged that this question is fatally defective in its statement or hypothesis "that there was an unusually mild surf that night so that it could not be seen or heard in time to prevent the steamer from going too near the land." There was evidence tending to show such a condition of the surf. It is true, as argued, that if the steamer had been going at a very slow rate and without sail, no one could say whether the surf might not have been heard. But the question contained a statement of the rate at which the steamer was going and that she was under steam and sail and the statement in regard to the surf was made with reference to the statement in regard to the rate of speed and manner of propulsion of the steamer, and whether the rate of speed and method of propulsion were proper under the circumstances was involved in the question. It is urged, secondly, that the question was defective in not stating the danger of approaching Upolo point due to variable winds, shifting currents, and the difficulty in making out the low-lying land in front of higher land. As to the difficulty in making out low lying land in front of higher land, and with reference to this particular point of land with which he was familiar, the witness had just been examined, and therefore the statement in the hypothetical case that the steamer was approaching this point was all that was necessary. As to winds and currents, not only was the witness familiar with these, but it was the contention of the counsel who put the question that the danger from these was no greater at this point than at any other point and there was evidence to sustain such contention. It is further urged that it is objectionable to ask whether a person is negligent or whether he omitted anything that ought to have been done. To have asked the Captain himself whether he was negligent in any respect or to have asked a witness who was present at the disaster whether the

Captain was negligent in any respect, or to have asked an expert whether on all the evidence in the case the Captain was in his opinion negligent might have been improper. But to ask an expert his opinion in a proper case, upon a hypothetical case, stating what there is evidence to support and substantially all that counsel relies upon, is proper. No doubt the questions now under consideration might have been improved in form. But the trial Judge apparently kept the correct principles in mind and something must be left to his discretion, and from the entire testimony we cannot see that the plaintiff was in any way prejudiced by the form of the questions objected to in this case.

In *Transportation Line v. Hope*, 95 U. S. 297, which was an action for the loss of a barge and her cargo while being towed by defendant through Long Island Sound, an expert was asked: "With your experience, would it be safe or prudent for a tugboat on Cheaspeake Bay, or any other wide water, to tug three boats abreast, with a high wind?" The Supreme Court of the United States held the question proper.

In *Union Insurance Co. v. Smith*, 124 U. S. 405, the shaft of a tug having broken in Lake Huron, the issue was whether her master exercised proper care in having her towed to Cleveland, her home port, over Lake Erie in which she sank, instead of having her repaired at Port Huron or Detroit. The court held it proper to ask experts whether under the circumstances it was good seamanship and prudent to bring the tug through to Cleveland.

In *Propeller Niagara v. Cordes*, 21 How. 7, the propeller, put into Presque Isle at night, in a storm, on Lake Huron, for shelter, and was there stranded. Experts were allowed to testify whether under the circumstances it was good seamanship to put into the harbor and whether, after the vessel got inside, the master took such precautionary steps as amounted to ordinary prudence.

In *Hill v. Sturgeon*, 28 Mo. 323, an action for the value of goods shipped, the steamer and barge towed by the steamer, while running up the Mississippi river at night, sheered against

a bank so as to force in the side of the barge and cause her to sink. It was held competent to ask an expert whether it was proper to suffer the person at the helm, a mere steersman, to pilot the boat at the time and place of the accident.

In *Hayward v. Knapp*, 23 Minn. 430, experts were allowed to testify as to whether the place where a brail of logs was moored was a safe place.

These cases show how far many courts have gone in admitting expert testimony in nautical matters. Some of them went further than the trial court went in this case. No doubt it is best, as has often been said, not to extend the cases in which expert testimony may be admitted or the classes of questions that may be put to expert witnesses. Much must depend on the circumstances of each case. In the present instance the plaintiff's case was so general that the defendant could not very well avoid putting some rather general questions to expert witnesses.

An exception was taken to the refusal of the trial Judge to instruct the jury, as requested by the plaintiff that, "It is against public policy to permit a common carrier to stipulate for exemption from the effects of the negligence of himself or his servants, and therefore if the loss in this case was occasioned by the negligence of the defendant or its servants, the plaintiff is entitled to recover of the defendant the full value of its goods and interest from date of demand."

The case was tried mainly on the theory that the negligence, if any, was on the part of the Captain or First Officer, but there was some question raised as to whether the Company itself was not negligent in not having a sufficient supply of coal on board to enable its steamers to avoid coasts by steaming against head winds and waves, or in not having a sufficient number of vessels to do the business and yet take the requisite time to slow down when approaching coasts, &c., and the main argument in support of this instruction is that it covers the case of negligence on the part of the defendant itself as well as on the part of its servants. But, although the defendant did not claim to be exempt from liability for its negligence, if any, as distinguished

from the negligence of those in actual charge of the steamer at the time, yet the substance of the instruction now in question was in fact given in the form of another instruction requested by the plaintiff as follows: "The law imposed upon defendant, as a common carrier, the public duty of seeing to it that every reasonable and proper precaution was taken to prevent loss and if the loss resulted from any failure in this regard, the defendant is liable." An instruction need not be given in the form requested if substantially given in another form and substantially the same statement need not be repeated in different forms.

The exceptions are overruled.

*A. S. Hartwell*, for plaintiff.

*Kinney & Ballou*, for defendant.