Stirling, *et al. vs.* Nevassa Phosphate Company.

</div>

(Decided 1st February, 1872.)

---

WM. STIRLING, WASHINGTON TALL, and others, *vs.* THE NEVASSA PHOSPHATE COMPANY.

*Duties and powers of the Master of a Ship in a Port of necessity—General average—Contribution —Agency.*

The master of a ship is the agent of the owners with power to bind them for repairs to the extent of the value of the ship and freight, but not further, unless expressly clothed with larger authority: there is no presumption from the law of agency to justify expenditure beyond that limit.

The owner of the cargo, in a case where expenses had been thrown upon the cargo exclusively, would have the right to call upon the owner of the ship for contribution to the extent of the value of the ship and

Stirling, *et al.* *vs.* Nevassa Phosphate Company.

freight, but not further; the master under such circumstances being considered as acting for the benefit of all parties interested.

Whenever exigencies require the master to act for the benefit of other parties, to that extent his authority as agent of the ship-owner is abridged.

The master cannot do what a prudent owner, if present, would not do, and the law will not assume that a prudent owner would make repairs beyond the value of his vessel, when repaired.

Where vessel, freight, and cargo are pledged towards the repairs of a ship by the master, and the entire proceeds of the vessel and freight are insufficient to pay them, it is a fair presumption, in the absence of proof to the contrary, that beyond that limit the master was acting in behalf of the owner of the cargo.

Where the cargo alone is jeopardized from causes for which the owner of the vessel is not responsible, he is not personally accountable.

Where the master acts for all parties interested, the loss falls upon the owners of the ship and cargo in the proportion of their respective interests

Under some circumstances, the master may act as the agent of the owner of the cargo, independent of his agency for the owner of the ship.

APPEAL from the Superior Court of Baltimore City.

At the trial below the appellants offered a plea to the third count in the appellee's declaration, averring the essential facts in the case, an abstract of which is given in the opinion of the Court. To this plea the appellee demurred, and the Court sustaining the demurrer, judgment was entered by consent for the appellee, subject to the decision of the Court of Appeals upon the demurrer. All errors, if any, in the pleadings on both sides were waived.

The cause was argued before BARTOL, C. J., STEWART, BRENT, ALVEY and ROBINSON, J.

*T. W. Hall, Jr.,* and *Geo. Wm. Brown,* for the appellants.

It is a fundamental principle of the law of general average—*first,* that there shall be a sacrifice of a part for the

benefit of the whole, as in the original case of jettison; and *secondly*, that the sacrifice shall be successful. 1 *Parsons' Marit. L.*, 288; *The Star of Hope,* 9. *Wall.*, 228.

Here the *whole* has been sacrificed, and *nothing* has been saved.

If the master had sold, as he had a. right to do, the vessel at the port of distress, there would have been no claim to contribution, but each would have borne its own loss. 1 *Parsons' Marit. L.*, 60, (*n.*) 63, 315.

In this case there was no *obligation* to repair. . The master may abandon to the underwriters when the cost of repairing his vessel would be equal to one-half of her value. *The Amelie,* 6 *Wall.*, 18; *De Cuadra vs. Swann,* 16 *C. B.*, (*N. S.,*) [111 *E. C. L.,*] 792.

A claim for contribution can properly be said to exist only where the owner of the thing sacrificed claims to be compensated by the owner of that which is saved by the sacrifice. Here not only was the vessel not saved by the sacrifice, but if any thing had been saved, it would have been the cargo, not the vessel; the latter being the *primary* fund to satisfy the bottomry bonds, and the cargo only *secondary*. *The Bonaparte,* 3 *W. Rob.*, 302; *The Ship Packet,* 3 *Mason,* 255.

The vessel was in fact "the martyr of the cargo." *The Gratitudine,* 3 *C. Rob.*, 240.

It is the fundamental principle of the law of general average that all the interests for which the sacrifice is made, and *which are* actually saved, contribute according to their value.

How shall that which is already lost contribute? The plaintiffs' claim involves the paradox of calling upon the owners of the vessel to contribute more than they had at stake, (*i. e.*, vessel and freight,) and to contribute for saving that which they have lost. 1 *Parsons' Ship. and Adm.*, 416; 1 *Parsons' Marit. Law,* 320.

The present suit is an attempt to fasten upon the owners, through the act of the master, *indirectly*, a liability which the law gave the master no power to impose upon them *directly*.

Stirling, *et al. vs.* Nevassa Phosphate Company.

The bottomry holders could not have sued the defendants personally for any deficiency on the bonds; but it is argued that the plaintiff, whose cargo was equally bound with the defendants' vessel, may sue. This "cannot be done." *Naylor vs. Baltzell, Campb.,* 65, (*Taney, C. J.*); *The Virgin,* 8 *Pet.,* 553, 554.

Under the circumstances of the case, the master had no right to repair, and no right to execute the bonds. It is admitted by the pleadings that in repairing the vessel at a cost largely exceeding her value, when repaired, with all the freight she could earn by the completion of the voyage, the master did what "*no prudent owner*" would have done. *The Grapeshot,* 9 *Wall.,* 141; *The Aurora,* 1 *Wheat.,* 96.

In making the repairs in question, and hypothecating, for the purpose, the cargo as well as vessel and freight, the master must be considered as having acted solely for the benefit, and as the agent of the owners of the cargo.

The capacity of agent for the owners of the cargo may be, and often is, thrown upon the master in case of necessity, and his acts in that capacity give them no claim against the owners of the vessel. *The Gratitudine,* 3 *C. Rob.,* 240–257; 1 *Parsons' Marit. L.,* 435.

By the maritime code to which we are referred for the law of the case, both as to the power of the master, and the liabilities of the owners, the liability of the latter for the acts of the former cannot extend beyond the value of vessel and freight. That fund being exhausted, or not having come to their hands, no pretence of a *personal* liability on the part of the owners, such as is sought to be enforced in the present action, can be set up, or exists. *Naylor vs. Baltzell, Camp., C. C. R.,* 65; *Emerigon on Maritime Loans,* (*Contrat a la Grosse,*) 101–113; *Wattson vs. Marks,* 2 *Am. L. Reg.,* 166, 167; *Lloyd vs. Guibert,* 1 *Law R. Q. B.,* 124; *Insurance Co. vs. Dunham,* 11 *Wall.,* 26–28; *New Jersey Navigation Co. vs. Merchants' Bank,* 6 *How.,* 344; *Morewood vs. Enequist,* 23 *How.,* 493; 1 *Parsons' Ship. & Adm.,* 21, 22.

*S: Teackle Wallis*, for the appellee.

The validity of the bonds is not involved in this appeal. They could not have been successfully impeached, even as against the holders. The lenders were not bound to inquire into the expediency of the repairs if apparently necessary, and the advances were made in good faith. *Abbott on Shipping*, 161; *The Vibilia*, 1 *Wm. Robinson*, 1.

It might have been inexpedient, looking only to the interest of the appellants, for the master to make the repairs; but it was nevertheless his duty to the appellee to make them. A prudent owner might, if present, have violated his contract, because it would cost him less to pay the damages therefor, than to fulfil it. The master owed duties to others than his principals, and as their agent rightfully discharged them, even if the interest of his owners would have been better promoted by not doing so. *Pope vs. Nickerson*, 3 *Story*, 487.

The master was *bound* to repair his ship and complete his voyage. If he had not done so, the ship owners would have been liable to the shippers for breach of contract. In making the repairs he was only fulfilling, as agent of the appellants, their obligation to the appellee. *The Niagara vs. Cordes*, 21 *Howard*, 24; *The Maggie Hammond*, 9 *Wallace*, 458.

He was bound, in fulfilment of this obligation, to pay for the repairs with the money, or on the personal credit of the appellants, if possible. Nothing but the impossibility of doing so, justified him in borrowing, as he did, on bottomry of the vessel and cargo. 1 *Parson's Maritime Law*, 415; *The Ship Packet*, 3 *Mason*, 263; *The Grape Shot*, 9 *Wallace*, 135.

For the fulfilment of this duty, he was justifiable in executing the bonds on the ship, even if there was no possibility of her being benefitted by them.

Where the bonds cover vessel and cargo, Courts will so marshal the assets as first to take the property of the ship owner for it, being a debt which he ought primarily to bear.

*The Packet,* 3 *Mason,* 267; *The Bonaparte,* 1 *Eng. Law and Eq.,* 641; *La Constancia,* 2 *Wm. Robinson,* 406.

If the repairs had been paid for with the money or credit of the ship owners, without the execution of the bonds, they could have recovered from the shippers their contributory share—if with the money or property of the shippers, the latter could have recovered from the ship owners their contributory share. Why should the fact of the money having been borrowed on bottomry to pay for the repairs, alter the relations or equities of shipper and ship owner towards each other?

That the lenders had no personal claim against the ship owners is no reason why the appellee should have none, if as between it and the appellants, it or its property paid a part of the appellants' contributory charge.

This is not a case of general average because of *sacrifice,* but of *contribution* on account of *expenditure.* It makes no difference, in such cases, whether the ship and freight were saved or not, though here, in contemplation of law, they were saved. *Spafford vs. Dodge,* 14 *Mass.,* 64, 74, 80; 2 *Arnould on Insurance,* 893, 921, 925; 2 *Phillips on Insurance, secs.* 1319, 1356; 2 *Parson's Marine Insurance,* 295; *Stevens and Benecke on Average,* 69, 70, 196, 199, 200; *Tudor's Mercantile Cases,* 71, 73, 106; *Duncan vs. Benson,* 1 *Excheq.,* 537, 556; *Benson vs. Duncan,* 3 *Excheq.,* 644; *Benson vs. Chipman,* 2 *House of Lords' Cases,* 713.

STEWART, J., delivered the opinion of the Court.

The action in this case was brought by the appellee, the owner of the cargo, against the appellants, the owners of the Brig Georgia, to recover for the contributory share for certain jettisoned cargo, and expenses chargeable to the brig and freight for certain bottomry bonds, in a general average contribution. The brig and freight being insufficient to meet this contribution, the cargo was taken for the payment of the deficiency, and the appellee claims to be indemnified by the appellants.

Under an agreement of the parties, the question to be determined, arises out of the facts averred in the third plea of the appellants to the third count of the appellee, to which third plea the appellee demurred.

From the allegations of the third plea, with its reference to the statements of the third count, it appears that on the 11th day of November, 1868, the appellee being the owner of 450 tons of guano valued at $8,000, at the Island of Nevassa, in the Caribbean Sea, shipped it on board the brig Georgia, belonging to the appellants, to be conveyed to the port of Baltimore, in the State of Maryland, under a contract of affreightment containing " the exceptions of the dangers of the sea," for the sum of $8 per ton freight; that in the course of the voyage the master of the brig jettisoned thirty-five tons of the guano, owing to the perils of the sea, for the common benefit and safety of the brig and the balance of the cargo. It then avers that whilst proceeding on her voyage the brig was greatly injured by the perils of the sea, which made it necessary for her to put into the port of Kingston, Jamaica, and afterwards into the port of Keywest, Florida, for repairs, to enable her to resume and complete her voyage, if advisable, with the remainder of the cargo on board; that the damages could not be repaired to enable the brig to proceed on her voyage, except at a cost for repairs at the port of Kingston of $7,599 in gold, and for the repairs at Key West, of $2,328 in American currency, exceeding for the first mentioned, as well as the aggregate of said sums, what would be the entire value of the brig, after such repairs, on her arrival at Baltimore, and all the freight she could earn on said voyage, in case she could, when so repaired, resume her route and safely arrive at Baltimore with the cargo on board.

It further avers, that no prudent owner would have incurred the expenses of such repairs; that the master of the brig, as to the interests of the appellants, did imprudently cause the repairs to be done upon the brig, and that in order to obtain the funds necessary for the repairs, the master exe-

cuted the two bottomry bonds in the declaration mentioned—the one at the port of Kingston for the repairs there, and the other at Key West for the repairs at that port, each of the bonds hypothecating and binding the cargo as well as the brig and freight.

That the master, in making the repairs and executing the bottomry bonds therefor, acted without any authority from the appellants, and without their knowledge and privity. That the brig resumed her voyage, and with the cargo on board, except what had been jettisoned, arrived safely at Baltimore.

That upon her arrival, by an agreement in writing entered into between the appellants and appellee, on the 24th of April, 1869, to which the master was also a party, a certain James Carey Coale, of Baltimore, was authorized to make such disposition of the brig and cargo, or their proceeds, as he might deem proper and expedient for their common benefit, and in particular to make in their name, such arrangement and agreement with the holders of the bottomry bonds, as he might deem advisable for the satisfaction of the bonds upon the brig and cargo.

That the proceeds of the sale of the brig, together with the freight earned, were applied to the satisfaction of the bonds, but that the entire value of brig and freight were insufficient to pay the debt, and there remained due to the holders of the bonds a large sum.

That by reason of the said several matters, and of the Act of Congress in such case provided, they are not liable for the acts of the master in executing the bonds, and the consequences thereof. Under these circumstances the question arises whether the appellee, the shipper of the cargo, is entitled to recover for this excess from the appellants, the owners of the brig.

There can be no doubt the master of the brig was the agent of the owners, with power to bind them for any repairs to the extent of the value of the brig and freight, but his agency is

circumscribed and defined by the nature of his business, unless expressly clothed with larger authority by the owners of the brig.

The demurrer concedes that no prudent owner would have made such repairs. To permit such expenditures to bind the owners, under the circumstances, beyond the value of the brig and freight, it seems to us, finds no warrant in the law of agency, or in any sound principle of law or policy applicable to maritime pursuits, and that the maintenance of any such rule would be ruinous to the owner of the ship. When from the perils of the sea, the brig in this case had been so damaged that the master discovered repairs of that magnitude would be necessary to enable the vessel to resume her voyage, which no prudent owner, if present, would make or sanction; he, as master, ought not to have incurred them.

It was not his duty, and he had not the power from the character of his employment, thus to involve his principals. Under such circumstances he had the right, for the benefit of the cargo and all persons interested, to tranship the same, if a suitable vessel could be conveniently found to convey it to its destination. In such case the extra expense of transhipment of the cargo would be chargeable to the owner thereof.

The conduct of the master and the respective rights and obligations of all parties interested, under circumstances of disaster to the voyage, must be determined according to the principles of justice applicable to such case; and the power and duty of the master may be tested by what the owner, as a discreet man, would do, if he were present acting for himself. The transportation of the cargo may derive more benefit from such expenditures than the vessel, because the master by the repairs thereof, may save the shipper from the payment of the extra freight, in case of transhipment or probable loss, if no conveyance could be had.

We find the duty of the master very clearly stated in the case of the *Propeller Niagara vs. Cordes, et al.,* 21 *How.,* 24.

"As agent of the owners, the master is bound to carry the loads to their place of destination in his own ship, unless he is prevented from so doing by some cause arising from irresistible force over which he has no control, and which cannot be guarded against by the watchful exertions of human skill and prudence. When the vessel is wrecked or otherwise disabled in the course of the voyage, and cannot be repaired without too great delay and expense, he is at liberty to tranship the goods and send them forward so as to earn the whole freight; and if another vessel can be had in the same or a contiguous port, or one within a reasonable distance, it becomes his duty, under such circumstances, to procure it and transport the goods to their destination, and in that event, he is entitled to charge the goods with the increased freight arising from the hire of the vessel so procured."

" That rule, however, is not obligatory in cases where the goods are not perishable, provided the ship can be repaired in a reasonable time. In that state of the case, he may, if he deem it best, retain the goods until the repairs are made, and forward them in his own vessel; and upon the same principle, and for the same end, if he have no means to tranship the goods, it is his duty to repair his own vessel, when capable of being repaired, provided it can be done in a reasonable time, and he has the means at his command, and if not, and the means cannot be obtained from the owner, or upon the security of the ship, he may sell a part or hypothecate the whole and apply the proceeds to execute the repairs, in order that he may be enabled to resume his voyage and carry the goods, or the residue, to the place of destination, and he is not entitled to recover for freight if he refuses to tranship the goods, unless he repairs his own vessel within a reasonable time, and carries them to the place of delivery."

The owner of the cargo, in a case where the expenses had been thrown upon the cargo exclusively, would have the right to call upon the owners of the vessel for contribution or payment to the extent of the vessel and freight—any thing

beyond must be borne by the cargo, the master, under such circumstances, being considered as acting for the benefit of all parties interested. It is stated in 1 *Parsons on Ship. & Adm.*, 235, 236, "the rule, as usually expressed, is, that the master must tranship if he can, and may then charge the *excess* of the cost of transhipment over his freight, to the owner of the goods. The reason of this is, that as soon as such an exigency arises, the master is clothed, from necessity, with authority to act as the agent of all interested—for the ship-owner, he must do what can be done to save his freight; for the shipper, he must do what can be done to save his goods and send them to their port of destination.

It has been declared by the Supreme Court of Massachusetts, that after the owners have no longer any pecuniary interest in the ship or the freight, because nothing of either can be saved or protected by any act of the master, he is no longer their agent, in the sense of having any authority to bind them."

Chief Justice TANEY, in *Naylor vs. Baltzell, Campbell's C. C. R.*, 67, very clearly expresses his views : "The master has the power to pledge the ship and freight, only in cases of necessity, that is to say, where it is necessary for the interest of the owner, or there is reasonable ground to believe it to be for his interest. Now, it can never be necessary for the interest of the owner of the ship, to place upon her repairs which will more than double the amount of what she is worth after the repairs are made. There may be cases in which it may be for the interest of the cargo to do so, because the cargo may be of great value at the port of destination, and of little or no value at the port of necessity. It may be for the interest of the cargo to have repairs made upon the ship, far beyond her value, in order to enable him to transport his property to its destination. If there was any necessity which would have justified the enormous expenditures for repairs in this case, it must have been the necessity of the cargo, and not that of the brig, for the repairs unavoidably

sacrificed the vessel and freight, and nothing could be gained by them except for the cargo."

No prudent owner would make such repairs on his vessel which would more than exhaust all her value and the freight. Such hypothesis would violate all the known rules that govern human actions. The owner of the cargo might find it to his advantage, and be willing to have them incurred, upon the responsibility of the cargo, for any excess over the value of the vessel and freight.

In 2 *Pars. on Ship. & Adm.*, 22, 23, it is stated: "Exigencies may arise, in which the master becomes, of necessity, supercargo, and is clothed with whatever agency or authority may be needed to enable him to protect the property and interests intrusted to him."

"He may sell the whole cargo, if he can neither take it on nor tranship it, and it is perishable and will be destroyed or materially diminished in value, before he can obtain instructions from the owners. He may sell a part of the cargo, in order to raise funds to pursue the voyage and carry on the remainder. But not until other means of raising money are exhausted, including the drawing of bills on the owner, hypothecating the ship, or making other use of the owner's property or credit."

"The beneficial effect of the sale of the cargo will extend to the ship, by enabling her to earn her freight, and even if the ship profit most by it, yet if a part of the purpose and effect be to carry on the cargo that is not sold, it will be justified as an act for the common benefit."

The power of the master is simply commensurate with the duties devolved upon him, under the circumstances in which he may be placed by the fortunes of the voyage, bound to protect and subserve all the interests within the range of his employment.

Whenever exigencies require him to act for the benefit of other parties, to that extent his authority, as agent of the owner of the ship, is abridged.

Judge STORY, in *Pope vs. Nickerson,* 3 *Story's R.,* 495, says: "There is no reason to say that a master of a ship has any more authority to bind the owners, than any other agent has to bind his principal."

In 2 *Parsons on Ship. & Adm.,* 7, it is stated that, "to know what the authority of the master is, in general, or under any particular circumstances, we must appeal to the law of agency, and the principles of that law which are applicable to the particular case."

Upon what principle of construction as to the powers of an agent, can it be inferred, that the owner of a vessel would, under any circumstances, authorize his agent, the master, to involve him in expense for the repairs of the vessel, from which no possible profit could be derived to him? The contract of affreightment does not compel such a course, because he is, by it, exonerated, if the perils of the sea have occasioned the disability of the vessel to transport the cargo.

"The general limitation of the power of the master to bind the owner by the contracts he makes for him, is this: they must relate to the condition, or the use and employment of the ship, and be within the usual duty and business of a master. They must not be so unreasonable in themselves as to raise the suspicion that the contracting party acted fraudulently or recklessly in making them." 2 *Parsons on Ship. & Adm.,* 11.

"The master may certainly bind the owners for supplies and repairs, if they are necessary; but he can only procure such repairs as are properly speaking, necessary for the ship, that is such as are reasonably fit and proper, having regard to the exigencies and requirements of the ship, for the port where she is lying and the voyage on which she is bound." *Bliss vs. Ropes,* 9 *Allen,* 341, referred to in 2 *Parsons on Ship. & Adm.,* 16.

"The only, and the reasonable rule must be, that the owner authorizes the master to do everything within the scope of a master's employment, which a rational owner would certainly

do for himself if he were present at that time and place."
2 *Parsons on Ship. & Adm.*, 18.

In the case of the *Virgin*, 8 *Peters*, 538, an appeal to the
Supreme Court from the Circuit Court of the United States,
for the District of Maryland, where the bond merely hypothe-
cated the ship, and questions arose as to the operation and
effect of the bond, the Supreme Court decided that a bond
may be good in part and bad in part, and that it will be up-
held by Courts of Admiralty, as a lien to the extent to which
it is valid; as such Courts in the exercise of their jurisdiction,
are not governed by the strict rules of the common law, but
act upon enlarged principles of equity; we think the reason-
ing of the Court in that case is confirmatory of the view we
have taken of this case. The Court say, "in England and
America the established doctrine is, that the owners are not
personally bound, except to the extent of the fund pledged
which has come into their hands. In this case, the value of
the ship, the only fund out of which payment can be made,
falls far short of a full payment of the amount due upon the
bottomry bond. But this is the misfortune of the lender,
and not the fault of the owners—They are not to be made
personally responsible for the act of the master, because the
fund has turned out to be inadequate; since, by our law he
had no authority by a bottomry bond to pledge the ship, and
also the personal responsibility of the owners." Where the
master is only authorized by bottomry to pledge the vessel,
freight and cargo, and because the cargo is sold under the
bond, to hold the owners responsible for any amount beyond
the vessel and freight, would, in effect, be giving authority to
the master through hypothecation of the cargo, to make the
owner of the vessel responsible.

The master cannot directly or expressly, by a bottomry
bond pledge the ship, and also the personal responsibility of
the owner; nor can the owner be constructively held per-
sonally bound by the execution of the bond. It is apparent,
the Supreme Court, in the case of the ship Aurora, 1 *Whea-*

*ton,* 102, considered the master's authority limited to the value of ship and freight. They say " the master of the ship is the confidential agent of the owners, and they are bound to the performance of all lawful contracts made by him, relative to the usual employment of the vessel, and the repairs and other necessaries furnished for her use. This rule is established as well upon the implied assent of the owners, as with a view to the convenience of the commercial world. As, therefore, the master may contract for repairs and supplies, and thereby, indirectly bind the owners *to the value of the ship and freight,* so, it is held that he may, for the like purposes, expressly hypothecate the ship and freight, and thereby create a direct lien on the same, for the security of the creditor. But the authority of the master is limited to objects connected with the voyage, and, if he transcends the prescribed limits, his acts become in legal contemplation mere nullities."

Chief Justice TANEY, directly in regard to the question now involved, states the rule: (*Naylor vs. Baltzell, Campbell's C. C. Rep.,* 641–65.)

" In the case before us then, the master had a right to pledge the ship and freight, in which case the owners are answerable no further than the amount of the pledged fund which came to their hands; or he might have pledged the personal responsibility of the owners to the value of the ship and freight, in which case if the ship had been lost on the voyage, they would have been responsible to that amount. This is the extent of the authority which the law gives to the master in a foreign port, and if he exceeds it, his acts are void. If, therefore, the master had pledged to the bottomry lender the personal responsibility of the owners to the value of the ship and freight, and *cargo* also, the pledge as respects the value of the cargo would have been void, and the owners not responsible. Can he then by pledging to the bottomry lender the cargo, enlarge his authority in relation to the personal responsibility of the ship owner, and indirectly bind him, not only for the value of the ship and freight, but for the value

of the cargo also? The limitations upon the power of the master, so carefully stated by the Supreme Court, are utterly nugatory, if by this circuitous mode, he is permitted to do what he cannot do directly; and by hypothecating the cargo, exercise a power over the fortunes of his owners to an unlimited extent. We think it cannot be done; and that the value of the ship and freight only were bound so far as the ship owners were concerned—and as no part of that fund has come to their hands, they are not personally responsible either directly or indirectly. We are satisfied that at this day, this is the general understanding of those who are engaged in commerce, and that the contracts are always made by both parties under that impression—and there can be no necessity or propriety in pushing the liability beyond the bounds prescribed by the general usage and understanding of the commercial world." We think there can be no doubt of the correctness of this ruling. In 2 *Pars. on Ship. and Adm.*, 120, it seems to be taken as fully settled that "by the general maritime law, the responsibility of the owner of a vessel for the acts of the master and mariners, was limited to the value of the ship and freight."

When the master in undertaking to act for the ship owner, finds it necessary to repair the vessel in a foreign port after she is so disabled from the perils of the sea, as to render repairs necessary to enable her to resume her voyage and carry the cargo to its destination, he is considered as guided by the interests of his principal, the owner. If a prudent owner would not make the repairs in question, the master as his agent, ought not to make them—if he does make them the owner is not bound beyond the value of the ship and freight. It is a possible case that the master when he begins the repairs, may be mistaken as to the ultimate cost. This may exceed the value of the vessel and freight. The owner, had he been present, might have committed the same error.

But there is this difference between the acts of the owner and the master—the one is the principal, and the other but an agent. If the owner had ordered the repairs himself, of course

he would have been answerable, whether they were profitable to him or not, or if they exceeded the value of the ship and freight, because he would have been acting for himself; and no question could arise as to his authority to bind himself; although in such case his conduct might not be considered that of a prudent man. On the other hand, the master acting as an agent in the absence of the owner, has not the same unlimited authority over the vessel as the owner, but his power is necessarily restricted by the nature of his employment, and he ought not to attempt to do what a prudent owner would not do if present.

When the owner of the ship is absent, and repairs are made on her by the master, exceeding the value of the vessel and freight, there is no presumption according to any principle of the law of agency applicable to his employment, to justify such expenditure on his part as an agent of the owner: and where it is conceded, no prudent owner, if present, would have made or authorized such repairs, there is no ground for inferential authority on the part of the master to make them.

The law will not assume that a prudent owner of a vessel would make repairs on her beyond her value when repaired. Such a proposition would be unreasonable.

In the case of *Duncan vs. Benson*, 9 *Exch.*, 537, relied upon by the counsel for the appellee as enforcing a different principle, it is clear that the Court recognized the rule that necessity must create an agency on the part of the master, for the shipper, and for his interest, which will bind the shipper, where the sale of his cargo may be made either directly or indirectly for his benefit. Indirectly the shipper would be benefitted, where the damage to the ship and consequent repairs become necessary for the benefit of the cargo. In other cases, where, by no possibility, the shipper could derive benefit, there is no implied authority from him to the master, and the sale of the goods would be wrongful.

In *Benson vs. Duncan*, 3 *Exch.*, 656, also relied upon by counsel for the appellee, it is stated, " that there was no obli-

gation on the ship-owner as between him and the owner of the cargo, to do the repairs, and if he chose to do them through his agent, the master, acting (as the jury have found,) as a prudent, uninsured owner would have done, he voluntarily incurred the expense of such repairs for his own benefit."

To enable the Court to reach its conclusion, it will be perceived that it was upon the assumption that a prudent owner would have acted just as the master did ; therefore, the authority to make the repairs is inferred, and that consideration is an important element in the case.

So, in *Benson vs. Chapman,* 2 *House of Lords' Cases,* 720, also relied upon by counsel for the appellee, the remark is made, " that it is material to observe, that the special verdict does not state that the plaintiff, in common prudence, would not, if he had been present, have done precisely what the master did— that it is the duty of the master to repair the ship if there be a reasonable prospect of doing so at an expense not ruinous—In the absence of any finding to the contrary, we must assume that this duty was properly performed—the facts found by the special verdict are not sufficient to shew that the master acted beyond the scope of his authority; for he certainly had authority to act as a prudent uninsured owner would have done, and it is not found that an owner so situated would have acted differently."

Where vessel, freight and cargo are pledged towards the repairs of the ship by the master, and the entire proceeds of the vessel and freight are insufficient to pay them, it is a fair presumption, in the absence of proof to the contrary, that beyond that limit the master was acting in behalf of the owner of the cargo.

Under such circumstances, to assert that the master was acting in the line of his duty as the agent of the ship-owner, is unwarranted by any sound rule of construction.   The principles of distributive justice between all the parties interested, benefitted or injured, utterly ignore the conclusion that

the master, in such case, would be acting solely under the authority and for the benefit of his principal, the owner of the brig.

It is a much more reasonable theory that he was acting for the parties deriving benefit from his extraordinary conduct.

In *Benson vs. Duncan*, 3 *Exch.*, 654, it is stated, " that in ordering the repairs of the ship, the master acts exclusively as agent of the owner of the ship. No other person, but the owner or his agent, can have any authority to order the repairs. The owner of the cargo cannot insist on such repairs being made, for the ship-owner is absolved from his contract to carry, if prevented by the perils of the sea." There being no question as to the owner or master being the proper person to order the repairs, yet, as the master was not obliged to continue the voyage, but might have transhipped the cargo, and required the shipper to pay the extra cost of transportation, why should not the master be considered as acting in the interest of all the parties interested?

Is it more reasonable to give a narrow view to his conduct rather than, under the circumstances of disaster and necessity, to give to his acts a more enlarged construction, and in case of a successful termination of the voyage, to adjust the relative rights and obligations of all parties, as each may be benefitted, according to the principles of equity and justice?

No doubt the master may hypothecate the cargo for the benefit of the ship, and where this is done, the owner of the ship is liable for the loss sustained by the owner of the cargo, but it is against reason to say that the hypothecation of the cargo is for the benefit of the ship where it exceeds the value of the ship and freight.

The master may act as the agent of the cargo, under some circumstances, independent of his agency for the owner of the ship.

When the cargo alone is jeopardized from causes for which the owner of the vessel is not responsible, in such cases the owner is not personally accountable, and where the master

Stirling, *et al. vs.* Nevassa Phosphate Company.

acts for all parties interested, ship-owner and shipper, the loss falls on the respective owners of ship and cargo in the proportion of their several interests. See *Douglass vs. Moody*, 9 *Mass.*, 548; *Andrew vs. Marine Ins. Co.*, 9 *Johnson*, 32.

As was said in *Duncan vs. Benson*, of the celebrated judgment of Lord STOWELL, in the case of the *Gratitudine*, (in which he had expressed opinions not precisely according with the reasoning of the Court in the case of *Duncan and Benson*,) that Lord STOWELL'S views were to be taken with some modification, and that his judgment must be understood *secundum subjectam materiam*. So as to these cases in the House of Lords and Exchequer, the same remark is applicable. They are all founded, as we understand them, upon the assumption that the master, under the circumstances, must be considered as having acted within the scope of his authority, there being no evidence to the contrary.

In the present case, we must determine the legal effect of the master's conduct with the conceded averment, that no prudent owner of a ship would have incurred such expenditures as these in question.

The appellants have also relied upon the protection afforded by the Act of Congress, (1851, ch. 43,) which limits the liability of the ship-owner for certain acts of the master and mariners, to the value of the vessel and pending freight; but as we have disposed of the case upon the other grounds of defence, which we have deemed sufficient, it is unnecessary for us to express any opinion as to the operation and effect of the Act of Congress.

The Court below ought to have overruled the demurrer. Under the agreement of the parties, no new trial will be ordered.

*Judgment reversed.*

(Decided 1st February, 1872.)