**AUTOMOBILE INS. CO. OF HARTFORD, CONN., v. HART—WOOD LUMBER CO. et al.**

**No. 9035.**

Circuit Court of Appeals, Ninth Circuit.

June 29, 1939.

Carroll Single, Stanley J. Cook, and John Hays, all of San Francisco, Cal., for appellant.

John H. Black and James M. Wallace, both of San Francisco, Cal., for appellees.

Before WILBUR, MATHEWS, and HEALY, Circuit Judges.

WILBUR, Circuit Judge.

Appellant filed a libel in personam against William H. Wood, and the Tacoma Shipping Company, a partnership composed of William H. Wood and Alfred Hart, and others, for the loss of a part of a deck load of lumber shipped on board the steam lumber schooner San Diego on August 13, 1935.

The San Diego was being operated by the co-partnership under a charter from the owners for operations along the Pacific Coast. E. L. Reitz, doing business under the fictitious name of E. L. Reitz Company, desiring to ship lumber belonging to him from Olympia, Washington, to San Pedro, California, entered into an agreement with W. H. Wood, acting for himself and for the copartnership, for the transportation of an entire cargo of lumber. The terms of this contract are in dispute. The appellant, the Automobile Insurance Company of Hartford, Connecticut, was the insurance carrier for E. L. Reitz, the owner of the lumber, and, because of the partial loss of the deckload of lumber, paid to E. L. Reitz the value of the lumber thus lost ($6,136.85), as a loan, such loan to be repayable only out of any net recovery which E. L. Reitz might make by reason of his claim for loss or damage to said lumber, and appointed libellant as his agent and attorney in fact to sue for the recovery of any such loss or damage.

E. L. Reitz declined to cooperate with the libellant in the recovery for such loss and, consequently, libellant brought the libel in its own name. Answers were filed setting up a number of defenses. Among others, that the loss was occasioned by a peril of the sea. The trial court, after hearing the evidence produced in court, and considering the depositions of witnesses presented to it, sustained the claim of the appellees that the loss was due to a peril of the sea and not to the unseaworthiness of the vessel or negligence of the crew. The libellant took this appeal, maintaining that no peril of the sea was encountered and that the loss was due to the unseaworthiness of the ship occasioned by the negligent manner in which the deck cargo was secured and the failure to take stability tests before the ship left port. It is agreed that if the finding of the trial court is sustained the decree must be affirmed and the other questions presented on the appeal become immaterial.

The trial court found that "on August 13, 1935, and in the course of said voyage,

the steamer San Diego encountered heavy weather and rough seas, and a large wave struck the said vessel and swept over her deckload with such force and violence and in such a manner as to cause some of the chain lashings to break and thereby cause a portion of the deckload to be lost overboard."

This finding virtually adopts the testimony of the captain, which was as follows:

"Q. It was not just one wave, was it? A. Absolutely one wave.

"Q. Absolutely one wave? A. Yes.

"Q. One wave that the vessel encountered caused the cargo to shift: is that it? A. That is right.

"Q. Was that wave different from all other waves in the sea? A. Absolutely, yes, because one wave filled up the officer's room."

It is claimed that this testimony is incredible and contrary to the laws of nature and should therefore be disregarded, although corroborated by another witness and by the log book.[1] We see nothing in the form of the entries to discredit them.

The evidence was that when the large wave struck the San Diego she was off Cape Blanco on the coast of Oregon, headed south by east, ⅞ east, true. The wind was from the northwest and consequently on the starboard quarter and the sea was running broad side to the ship on the starboard side. The wind was not extraordinary nor unusual for that neighborhood and time. The force of the wind was about six Beaufort scale (25 to 31 miles per hour) the waves running about 10 to 12 feet in height, not unusual for that season and neighborhood.

The testimony is that notwithstanding the fact that neither the wind nor the sea was so extraordinary as to constitute a peril of the sea, the one big wave which struck the vessel and partly filled her with water, causing her to list to starboard by reason of the weight of water taken aboard, was entirely unexpected and unusual and resulted in the shifting of the deck cargo toward starboard, the carrying away of some of the deck lashings securing the cargo and the loss overboard of a part of the deck cargo. Immediately after the ship was struck by this big wave the helm was put hard aport and the vessel brought

---

[1] The log books of the Pilot House and of the first mate contain the following entries:

"At 3.45 P.M. Vessel took a heavy sea over starboard side amidships and from then on commenced taking a heavy list to starboard.

"4.10 Vessels head was swung towards the sea on port helm, at which she straightened, all hands thightening deck lashings. 4.15 with head toward the sea on half ahead, vessel again took a dangerous starboard list. Helm was put hard aport, telegraph for full ahead, vessel swung with head to NE and laid so, listing more over continually. 4:30 Foreward deck load crumpled to starboard, lashing carried away, a minute later forepart of after deckload also dropped on starboard side. Vessel then listed to port and trew part of forward deckload.

"Apparent dammage: Sampson post broken; shroud starboard main riggan carried away and chainplates bendt or broken. One pulled out completely. Scuttle to Focsl. carried away. Seizing at masthead of shrouds starboard fore-riggin carried away. Top of Pilot House moved back about 3 inch. Starboard buffolow Focel. head split at break of Focel head. 4 chain lashings carried away with turnbuckles. Starboard— 2 boom guy destroyed."

From the Mate's log:

"At 3.45 P.M. Vessel took a heavy sea over starb. side amidships and from then on commenced taking a heavy list to starboard. 4.10 Vessels head was swung towards the sea on port helm at which she straightened, all hands tightening deck lashings. 4:15 With head towards the sea on half ahead, vessel again took a dangerous starboard list. Helm was put hard aport, telegraph for full ahead, vessel swung with head to N E and laid so, listing more over continuously. 4.30 Forward deckload crumpled to starboard, lashings carried away, a minute later fore part of after deckload also dropped on starboard side. Vessel then listed to port and threw part of forward deckload. When foreward deckload dropped No. 2 starb. boom unshipped and fell on Pilot House, damaging same. Boom fished up again.

"Apparent damage: Sampson post broken. Shroud St. main rigging carried away and chainplates bendt or broken, one pulled out complete. Scuttle to Forecastle carried away. Seizing at masthead of shrouds starb. fore rigging carried away. Top of Pilot House moved back about 3 inches. Starb. buffolon folke. head split at break of forecastle head. 4 chain lashings carried away with turn buckles. Starboard No. 2 boom guy destroyed."

head to wind where she lay to. Notwithstanding these precautions which caused the vessel to momentarily right herself, she took a further list to starboard and the deckload carried away.

The evidence showed that the deckload was secured in the usual fashion with chain lashings and turnbuckles which had been set up before the ship left the dock and which were tightened from time to time as they were loosened by the working of the deckload in the seaway.

The testimony is that the stability tests were taken as usual, while the vessel was at the dock, by suspending loads of lumber in the ship's tackle from two or three of the cargo booms extended over the sides of the vessel for the purpose of observing the list of the ship caused thereby.[2]

In addition to the testimony above quoted as to the sea encountered at the time of the loss of lumber, there was testimony to indicate that there was a cumulative effect upon the ship from continued exposure to the rough weather.

William Benthein, the second mate, was on the bridge at the time of the accident. He testified: "Q. Just tell us what you saw. A. Well, I couldn't say about that, the only thing I did see was a pretty heavy sea, it was running quite a sea and she got to hitting us over, shortly before four o'clock, and that is the time when it filled up the mate's room."

He testified he did not actually see the sea coming over the deck as it was coming up from behind, but he heard the water wash over and saw the water on the amidship's deck and on the deckload and on top of the deckload and the ship then took a dangerous list. The testimony is that a list of 10° or 12° with a heavy deckload of lumber was a dangerous list because it might cause the deckload to shift and in that event the ship would be in distress. There is no evidence to support the contention that the evidence of the captain is incredible and we cannot assume in the absence of such evidence that the stability of the ship, that is, the degree of its roll, coupled with the character of the sea, would not produce the incident as described by the officers of the ship under exceptional circumstances.

We conclude that the affirmative evidence justified the finding of the trial court that the ship was seaworthy, the deckload was properly stowed and secured, that the ship was properly manned, that there was no negligence, and that the loss of the deck cargo was caused by a peril of the sea either by an unusual and unexpectedly large wave, or by an unusual and unexpected roll of the ship into the wave due to an unusual and unexpected combination of circumstances, causing a list of the vessel and the carrying away of the deck lashings and the loss of the cargo.

In view of this conclusion it is unnecessary to consider other questions presented by the record as to the burden of proof and the terms of the contract of affreightment and the applicability of the Harter Act, 46 U.S.C.A. § 190 et seq., or of the Pacific Coastwise Lumber Conference Uniform Contract of Affreightment, or whether the vessel was a common carrier or a private carrier, because in any event it is agreed that the appellees were not liable for a loss due solely to a peril of the sea and without negligence. The Harter Act, 46 U.S.C.A. § 192; Atlantic Transport Co. v. Rosenberg Bros. & Co., The Manchuria, 9 Cir., 34 F.2d 843; The Indien, 9 Cir., 71 F.2d 752; The Nordhvalen, D.C., 6 F.2d 883; The Framlington Court, 5 Cir., 69 F.2d 300, 303; The C. R. Sheffer, 2 Cir., 249 F. 600; The Joseph J. Hock, 2 Cir., 70 F.2d 259.

The trial court announced its oral decision in favor of respondents on March 29, 1938. Thereafter, on May 16, 1938, appellant moved for a rehearing and the taking of the testimony of the first mate of the San Diego, Albert E. Larson, and submitted his affidavit stating his version of the loss of the lumber. Prior to the hearing of the application the respondents secured and presented to the court at the hearing another affidavit of Albert E. Larson purporting to again state the facts concerning the loss and also explaining the circumstances under which his first affidavit was given and the reasons why the first affidavit did not fully or correctly state the facts. The court denied the application for rehearing and thereafter signed and entered its findings of fact and decree. Appellant

---

[2] The cargo booms were about 76 ft long, extended over the side at an angle of about 45°; two or three sling loads were used in the test, containing from 1600 to 2000 ft. of lumber in each load.

asks us to reverse that decree because of the denial of its motion for rehearing and also to consider the application upon its merits, thus invoking the power of this court, sitting in admiralty, in a proper case to permit the introduction of additional evidence in this court or in the court below.

In view of the contradictory character of the two affidavits of the first mate and the fact that his later affidavit supports the decree in favor of the appellee, and owing to the delay in securing the attendance of the witness, the application was properly denied by the trial court and the renewed application to this court is denied.

Decree affirmed.