## UNITED STATES SMELTING, REFINING & MINING CO. v. WATERMAN S. S. CORPORATION.

### No. 571.

District Court, E. D. Louisiana,
New Orleans Division.

Sept. 20, 1945.

Bigham, Englar, Jones & Houston, of New York City, and Dart & Dart, of New Orleans, La., for plaintiff.

Deutsch, Kerrigan & Stiles, of New Orleans, La., for defendant.

CAILLOUET, District Judge.

The libelant alleges, substantially, that there was lost and damaged, respectively, parts of libellant's 1052 tons of structural steel that were delivered, for its account, to respondent at the Port of Baltimore, Maryland, for loading on its SS "West Kyska" and carriage by sea thereon to Seattle, Washington, to be there discharged and thence transshipped to Nome, Alaska, by other carrier than libelant; that such structural steel on delivery to respondent at the vessel's side, and also, inferentially, on load-

ing and subsequent departure from port, was all in good order and condition; that, however, said shipment which was loaded and carried, 771 tons on deck and 281 tons under deck, was discharged at Seattle "seriously injured and damaged, and short, namely, among others, 13 short #97 to 101 incl., #111 to 118 inc.; 70 damaged, various bends, #1 to 81 inc., #92 to 191 inc., #227 to 242 inc."

To the original libel was annexed, as part thereof, the straight bill of lading. It specifically provided (1) that the terms "Owner's Risk" and "O. R." meant that the carrier should not be liable for loss or damage "unless shown to have resulted from some negligence or default of carrier against liability for which it is precluded by law from contracting"; (2) goods carried on deck were at "owner's risk"; and (3) as follows, to-wit:

"This bill of lading shall be deemed to incorporate and shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, and nothing herein contained shall be deemed a surrender by Carrier of any of the rights or immunities or an increase of any of its responsibilities or liabilities thereunder; nor shall Carrier be deemed to have warranted the seaworthiness of the Vessel. The provisions stated in said Act shall (except as may be otherwise provided herein) govern before the Goods are loaded on and after they are discharged from the ship and throughout the entire time that they are in the custody of the Carrier. In respect of Goods carried on deck and stated herein to be so carried, all risks of loss or damage by perils incident to such carriage shall be borne by Cargo Owner but in all other respects the custody and carriage of such Goods shall be governed by the terms of this bill of lading and, except as otherwise herein provided, by the provisions stated in said Carriage of Goods by Sea Act notwithstanding Section 1(c) thereof. Carrier shall also have the benefit of Sections 181 to 189, inclusive, of Title 46, U.S.Code, and of all other statutes of the United States or any other country which may be applicable in the circumstances to grant Carrier exemption from or limitation of liability. * * *"

Exception having been taken to the libel on the ground that, on its face, it failed to disclose a right or cause of action against respondent, and the same having been duly sustained with leave granted, however, to amend, there was thereupon first filed, with reservation, what libelant denominated a supplemental and amended libel, setting out specifically, but no more than, the following new matter, to-wit:

"On information and belief, libellant alleges that on or about May 3, 1941, the said S.S. 'West Kyska', having libellant's cargo aforesaid on board, was proceeding at sea in normal weather, with a wind force of 3 on the Beaufort Scale, when the deck lashings to No. 1 port deck load gave way, permitting a quantity of said structural steel to slide overboard into the sea, and otherwise damaging libellant's cargo aforesaid; that prior thereto, namely, on or about April 15, 1941, respondent had permitted the bracings or lashings holding said cargo in place to break or become loose, and that the same were not thereafter properly secured but were allowed to remain insecure and insufficient to properly protect said cargo, and the loss of and damage thereto was caused by the aforesaid failure to properly stow and care for the said cargo."

Further exception being taken to libelant's pleadings, there was thereupon filed in due course, with repeated reservations, a re-drafted entire libel, in which was reproduced the aforementioned amendatory matter just quoted, by way of an added paragraph (b) to the fifth article of the libel, which otherwise remained substantially unchanged.

Respondent answered that if any shortage or damage occurred to libelant's shipment of steel, only the portion of such steel as was stowed on deck was involved, and that, under the terms of the bill of lading, no liability attached to respondent.

Pleading in the alternative, respondent then set up by way of defense that on May 3, 1941, while the West Kyska was proceeding to Seattle, she encountered a heavy westerly swell upon her port beam, causing her to roll and labor heavily; once rolling heavily to starboard and, upon the commencement of the counterroll to port, being struck by a wave which made her "righten suddenly, sharply, violently and with a twisting movement"; that this unusual movement caused the pelican hooks attached to the turnbuckles in the lashings securing the No. 1 deck stow of a portion of libelant's steel cargo, to straighten out; this allowed the hooks to slip out from under their shank rings, which released the chain

lashings of the stow whose full weight upon being thrown against the outboard stanchions, between stow and ships rail, sheared them off at the rail's level; following which, some steel plates in the stow slipped overboard. But respondent's contention is that the occurrence was in no way caused by unseaworthiness of ship or equipment, or by faulty stowage of the deck cargo, or by negligence or failure of those in charge of the West Kyska in caring for the cargo, and that, therefore, under the bill of lading terms already referred to, respondent is not liable to libelant for the value of the lost plates.

Respondent furthermore pleaded that it could be held liable, in no event, if damage or injury sustained by the cargo took place while such shipment was no longer in respondent's custody—or, that is to say, after discharge of the shipment by the West Kyska at Seattle, and the subsequent carriage thereof from Seattle to Nome, Alaska, by other vessel.

From the evidence it appears that the shipment of structural steel involved was not loaded on cars at the manufacturing plant at Lancaster, Pennsylvania, for transportation to shipside at Baltimore, until it had all been first assembled and piece-marked to assure proper fit on the contemplated job of dredge construction at Nome, Alaska.

The parties stipulated that the structural steel shipment was, at all times, libelant's property and that upon its delivery to the railroad cars at Lancaster, the shipment was in good order and condition, none of the pieces composing it having bends or distortions other than such as were required as part of the steel's fabrication process.

They further stipulated that if one F. A. Finch had been called as a witness he would have testified that, for 20 years continuously up to the date of trial inclusive, he was a surveyor of the Board of Underwriters of New York at the Port of Baltimore, Maryland, and, in said capacity, had inspected more than 10,000 ship loadings; that he was thoroughly familiar with the proper and adequate methods of stowing deck cargo on ocean-going vessels; that he held an unlimited master's license, any ocean, any tonnage, had acted as master of vessels at sea and, altogether, had 25 years of actual sea-going experience; that he attended the loading of the West Kyska, during March 1941, in his aforementioned of-

ficial capacity, for the specific purpose of determining whether the vessel's stowing was proper and adequate; that he saw the steel plate stow alongside the vessel's No. 1 hatch, and that such stowage was properly done and adequately secured, the lashings and gear used therefor appearing to then be in good and proper condition; and that he, thereupon, issued the usual and customary certificate of loading of The Board of Underwriters of New York, which he dated March 25, 1941.

They further stipulated, amongst other matters, that if certain named representatives of the respondent had been called as witnesses they would have testified that neither pelican hooks, nor turnbuckles to which attached, used in securing the West Kyska's No. 1 deck stow which went adrift on May 3, 1941, were ever subsequently delivered to respondent and were, so far as known by respondent, still on said vessel; and that title, ownership and control of said West Kyska passed to the United States of America (War Shipping Administration) as of August 26, 1943.

Libelant's construction engineer testified that he witnessed the loading of the greater part of the railroad shipment and, thereafter, the loading of a portion of the steel on to the West Kyska at Baltimore, and that at neither time did he observe "any particular little bends or anything that might have occurred in shipment", but that at Seattle, where he was also present for the discharge of cargo at the end of respondent's voyage, he did notice a few "bends or distortions" but took particular note of none, nor made a record thereof. In connection with his testimony, there was filed Libelant's Exhibit No. 1, i.e., a statement entitled "Nome Dredge No. 5, Pieces Damaged in Shipment", which the witness testified that he personally made up from damage listings appearing on dock slips, handed him at Nome, Alaska, upon discharge there of the steel shipment by other carrier than respondent.

The total cost to libelant for reconditioning and straightening out the damaged pieces listed, which included steel for the dredge job other than that forming part of the Pennsylvania shipment, identified by the letters L. I. W., was $2,094.04; which aggregate repair cost, by use of the weights set opposite the damaged pieces listed, respectively, can readily be pro-rated and al-

located between the two lots of steel involved.

The witness testified that in the loading of the West Kyska at Baltimore, one piece, about twenty-five feet long, was dropped with the result that it was bent in the center; so it was reported to him, he says, but he did see the piece, which had been set aside awaiting his inspection thereof and his consent to include it in the cargo notwithstanding its damaged condition. Such consent he did give, while keeping a record of the piece's identifying marks, which were: "Piece No. 131; Erection mark SSG–1.", he further testified.

It is to be observed, however, that no such piece is listed as damaged on the aforementioned Libelant's Exhibit No. 1.

The witness also testified that upon the West Kyska's discharge of libelant's steel shipment at Seattle, the cargo checked thirteen pieces short, and that the replacement value of such pieces F.O.B. Seattle was $8,064.18, which sum libelant actually disbursed in order to forthwith provide the necessary substitute pieces for carrying on the dredge construction work at Nome.

The Master of the West Kyska on the voyage in question was Captain Wood, 37 years, 22 years at sea, serving as a ship's officer since 1931 and holding a master's license since 1936.

He testified that both the Chief Officer and the Second Officer of the vessel had since died and that while the Third Officer, to the best of his knowledge, was alive and still sailing, he knew not his whereabouts.

There were five hatches on the West Kyska, he also testified,—two forward of the deck house, one between the bridge and the smokestack, and two aft of the engineroom; No. 1, on the port side forward, was approximately twenty-nine feet long by twenty in width, and the distance from the hatch coaming, which was about two high, to the ship's port rail was twenty feet, more or less; on port and starboard side of the coaming, at three equally-distant points, and opposite said points at the base of the ship's rail, were affixed to the deck, welded and bolted, pad-eyes or fixed loop openings or rings to which may be hooked chain lashings or the like.

Continuing, Captain Wood testified that it was the Chief Officer's responsibility to properly stow the ship's cargo, and that said officer personally supervised the loading of respondent's structural steel shipment at Baltimore; that he, himself, was not on board the West Kyska at all times during the loading of the vessel, but that the steel cargo was loaded to his satisfaction, both on deck and under deck.

The steel plates in the cargo, said he, had welded or riveted upon them, mostly on one side, brackets or ribs six to eight inches high, and it was, therefore, impracticable to use dunnage in the stowing of the cargo except between the first tier of the steel stacks and the deck floor; which was done. The portion of said steel cargo which was loaded on deck, was stowed on both port and starboard sides of the vessel's hatches Nos. 2, 4 and 5, and besides like steel stowed on the port side of the No. 1 hatch, there was steel on the starboard side of said hatch, although the witness swore that he did not remember what it looked like and that, therefore, he could not identify that stow as part of libelant's shipment.

The Master further testified that when the steel was being stowed on deck at Baltimore, it was first divided into the several piles which eventually made up the deck stow of 771 tons; that each of the several piles was stacked to a height of approximately eight feet and then there were stretched over and across said piles, in each instance but one, three galvanized chain lashings, with links of seven-eighths of an inch in diameter, running from the three pad-eyes at either port or starboard side of the hatch coaming over to the three opposite ones, located at the base of the ship's rail; that there were but two lashings used with respect to the stow on the port side of hatch No. 1, which stow was approximately twenty feet long and eight feet wide and high; that such deck stow, being considerably shorter than the others, no more than the two pad-eyes aft, of the three in line at the hatch coaming, and the two opposites at the base of the ship's rail, could be utilized for the lashing of said No. 1 hatch stow; that the ship's rail at this point was about three feet high and that three wood stanchions, six inches by six inches, twelve feet high, were set up, and braced against the bulwark or rail, in order to hold the steel pile in position away from the rail; that such bracing was effected by the laying of similarly-sized pieces of timber, except much shorter, on the deck between ship's rail and the heel of each stanchion, then running like pieces from the ends of the horizontal pieces at an angle to the stanchions, so as to make these cross-

braces rest on the uprights at a point approximately four feet from the deck, from which still other similar pieces, about six feet long, were jammed between stanchions and the top of the ship's rail and nailed fast; and that from the steel so stowed, with two chain lashings and braced stanchions, to the coaming of hatch No. 1, intervened a distance of approximately two feet, and between stow and port rail, six feet.

The Master insisted that because the stow, when so set up, was within two feet of the No. 1 hatch coaming, no stanchions could be erected on the inboard side; there was nothing there to brace against, said he. The two chain lashings, he then testified, came down inboard from the top of the steel pile to the two pad-eyes located at the base of the hatch coaming, at a slight angle. He swore that stanchions were used at none of the other steel piles, each of which was securely held by the customary three chain lashings, and that the use of stanchions was only made necessary at the No. 1 hatch stow, on the vessel's port side, because the structural steel was "well away from the rail," while such was not the situation as to any of the other cargo piles. Finally, he contended it was his opinion that the No. 1 hatch stow, as described, was an entirely proper one and that, besides its having been set up under the eye of surveyor Finch of the Board of Underwriters of New York, the stow was inspected by another surveyor of said Board of Norfolk, Virginia, port of call of the West Kyska on its voyage from Baltimore to Seattle.

Waldemar F. Berg, declaring himself a Master Mariner, with sea-faring experience of about 50 years on all oceans, with all sizes of ships, and as having handled "most every kind of cargo you can think of," who testified as expert witness for libelant, swore positively that such a stow as the one libelant complains of,—where there was but little security on the inboard side, by comparison with the precautions taken on the outboard—is bad stowage. He insisted that the two inboard lashings ran down to the pad-eyes, at the hatch coaming, in entirely too vertical a fashion; and that they, in no manner, protected the stow against side-sway to starboard against the lashings and then back to port against the stanchions. A much better stow, said he, could have been made by setting up stanchions on the inboard side between the steel and the No. 1 hatch, braced, with a chain lashing wrapped around the top of one of the inboard stanchions, at the uppermost surface of the stow, and thence stretched across the steel down to the deck pad-eyes on the outboard side; and with a lashing, additionally, stretched from the top of one of the outboard stanchions across the stow and over to the deck pad-eye beyond hatch No. 1. With such suggested lashings, the witness continued, the top of the stow would have been firmly held in place, whilst, with no more done to secure the stow than has been previously detailed hereinabove, side movement under the chains was to be expected.

The witness, upon having his attention called to the following excerpt from Bridger and Watts' work on "The Stowage of Cargo", which forms part of the documentary evidence now before the Court, viz.:

"It is necessary to see that sufficient good fastenings are provided to which the lashings may be secured. One often sees in such cases many turns of wire or chain taken round a piece of deck cargo and secured to a small ringbolt, which in its turn is perhaps lightly riveted to a hatch coaming or on deck. If the required number of good fastenings are not available it is always advisable to fit special ringbolts into the ship's side, and at or about the hatch coamings. This is very little trouble as ringbolts can always be bolted on with heavy bolts and are easily removed.

"When lashing a deck cargo, such as those above mentioned, consideration must be given to the side force exercised by a sea striking the vessel during heavy weather, and one must imagine the vessel heeled over to a considerable angle and tons of force being applied to the side of the cargo. The average landsman has not the slightest idea of the tremendous force exercised by a sea when striking a vessel's deck in bad weather.

"To compensate for this force, if the piece of deck cargo cannot be placed well in clear of the rail it must be tommed or shored from inside such as from the hatch coaming, mast, or other part of the ship.",

swore that he was in entire agreement with the so-expressed views of the authors on the subject of deck stowage.

At the trial, an additional stipulation was made and entered into by the parties. It was to the effect that the steel cargo described in the libel was discharged from

the railroad cars to the West Kyska, at the Port of Baltimore, by employees or agents of the respondent.

The vessel, according to its log and the testimony of the Master, Captain Wood, sailed out of Baltimore for Norfolk, Virginia, on the first leg of its voyage up the West Coast, on March 26, 1941, and left Norfolk for Savannah, Georgia, on March 28, 1941, from which port it departed for Jacksonville, Florida, on March 30, 1941.

The log entries as to weather and sea encountered from Baltimore to Jacksonville reflect no extraordinary conditions. The weather changed, at times, from hazy, clear, to partly cloudy, cloudy, overcast, drizzling rain, and the sea, from smooth to moderate northwest sea, rough beam sea, rough northwesterly sea, shipping seas starboard side, fore and aft. Also, the Master specifically testified that from Baltimore to the Panama Canal Zone nothing unusual occurred.

At Jacksonville, the two chain lashings over the No. 1 hatch stow of short structural steel pieces were removed and so were the top and the diagonal brace. Then between steel stow and rail was loaded creosoted lumber to about the same height as the steel, and over both steel and lumber two chain lashings were stretched. The three outboard stanchions to the steel stow no longer serving any useful purpose except to keep steel and lumber apart.

Thereafter, on the voyage from Jacksonville through the Panama Canal to Wilmington, California, where the lumber cargo was discharged, the same was carried where and as stowed, without loss or damage, although both Master and ship's log bear witness to the vessel's undergoing an unusual earthquake experience, while on the way, some 12 miles off the Mexican Coast, about 20 miles southeast of Cape San Telmo.

Such earthquake, the vessel's log recorded as having taken place on April 15, 1941, with two severe shocks, lasting two minutes each, and separated by an interval of 32 minutes. The Master, Captain Wood, testified that he was on the bridge during each shock and that he "saw the deck load shift," the cargo "clapping up and down and making an awful racket", while the "vibrating and jumping up and down of the ship" was so severe that "the men on deck appeared to be tap dancing," and the cargo moved at least six to eight inches up and down and sideways, although it was not displaced in all, though in some, places; particularly, was it not displaced at the No. 1 hatch.

He further swore that following the occurrence, due examination was made of the cargo and that the turnbuckles on the No. 1 hatch stow "appeared to be still in good order"; all chain lashings, however, were slack and were thereupon tightened.

The West Kyska, he continued, proceeded up the Mexican Coast without other interruption, meeting no particularly heavy seas as a result of the earthquake, but a rough sea was subsequently encountered in the neighborhood of the Gulf of Lower California; nevertheless, the voyage from the Panama Canal up to Los Angeles and thence to Wilmington, California, aside from the earthquake, was made under conditions of weather and sea no different than one would normally be led to anticipate on an intercoastal voyage during the Spring of the year.

His testimony furthermore covered what took place at and after the unloading and discharge of the creosote lumber cargo at Wilmington. The lumber was released from under the two lashings and unloaded, stanchions and braces were then re-set in their former positions and the same chains, though now shortened, were re-stretched over the steel, the pelican hooks placed in the pad-eyes, and the lashings thereupon made tight by use of the same turnbuckles; so that, in outward appearance, at least, the general situation on and about the West Kyska was as formerly existed when she left Baltimore, and, in the Master's opinion, the No. 1 hatch stow, considering the nature of the cargo, was properly lashed and conditioned for the remainder of the voyage.

From Wilmington to San Francisco the voyage was without unusual incident and the sea at no time was logged as more disturbed than moderately rough, with the West Kyska pitching moderately.

On the way from San Francisco to Seattle, the vessel encountered no weather but such as one would expect for that season of the year, Captain Wood testified.

Nevertheless, as his further testimony runs substantially, the West Kyska lost overboard a part of the libelant's structural steel, stowed on the port side of the vessel's No. 1 hatch. This happened on May 3, 1941, three days out of San Francisco, about 20 miles west of Gray's Harbor. No other deck cargo was so lost and all other deck stowage remained secure, nor did the vessel sustain any damage whatever on this leg of the voyage. The two chain lashings over

the particular stowage mentioned did not break, nor did the four pad-eyes, nor the two shackles attached to which the chain lashings were made fast on one end; but both of the two pelican hooks, next to the turnbuckles in said lashings at the other end thereof, did bend and thereby permit, in each instance, the forward end of the closed hook hinge to withdraw from and slip out of the grip of the link or ring which is "noosed" over the forward end of the pelican hook's hinged piece, in order to make tight the tie-in of chain lashing to the pad-eye. When the pelican hook so collapsed, the lashings were, necessarily, completely released and no longer held the steel cargo, with the direct result that, as is hereinafter detailed, the full weight of the upper half of the steel pile was thrown against the three port-side stanchions, sheared them off at about the level of the lowermost three feet or so of the stow which was braced against the ship's bulwark, and the loose steel slid to port over the bracing and the rail into the sea.

The loss occurred at 8:37 A.M. as both log entry and the Master recount. He testified that he personally examined the pelican hooks and the stanchions and found the former to have been freshly bent and to have pulled open, while the wood of the latter, clearly, had just been shivered and broken. With new pelican hooks and turnbuckles, but with the same chains, the remaining lower portion of the No. 1 hatch stow was made secure and the vessel continued in orderly course on its way to Seattle harbor, where it berthed on the succeeding day. Captain Wood swore that he made due report of the accidental loss of cargo to the West Kyska's agents at Seattle, and also to the Mobile Office of respondent. He did not submit the damaged pelican hooks and turnbuckles to the ship's agents for examination, said he, and, so far as he knew, the same were still on the vessel at the time he was testifying in May, 1944. However, it must be noted that the vessel had passed into Government control during August, 1943.

About one-half hour before the No. 1 stow went adrift on May 3rd (so further testified Captain Wood) and after he had previously requested, at breakfast, the Third Officer to see to it that all lashings were made "good and tight" as is usually done at the beginning of each day on a vessel carrying deck cargo, the Master ascended the bridge, where the Third Officer was in charge of the watch, and saw, standing at the No. 1 hatch, the First Officer with certain members of the crew who had just completed the tightening of turnbuckles in the deck cargo.

The wind, at the time, was force 3 on the Beaufort scale (8 to 12 miles, gentle) and a heavy westerly swell was striking the ship about two points forward of port beam, the vessel rolling heavily but running at its full normal speed of 10½ knots on a course of 341, standard compass. The rolling had been going on unceasingly from the early hours of the preceding night, Captain Wood continued, and just before the cargo loss he observed that the sea was "apparently building up gradually" although there was nothing unusual in the sky, and he was preparing to alter the West Kyska's course in order to prevent her rolling "so heavily." He remembered distinctly, said he, the heavy westerly swell, with the vessel's rolling deep and coming back gradually, which caused no sudden motion of the ship; but at 8:37 A. M., there occurred a very severe roll to port with the vessel "jerked kind of short" when the next wave struck her, causing a twisting motion as "she righted herself too sudden". It was then, he swore, that the pelican hooks "straightened out" and part of respondent's steel went overboard, but up to that moment, so reads the log, the deck load involved "had not been shifting or working any"; and thereupon the vessel's course "was altered to 305 per standard compass to ease ship" and her speed reduced to 10 knots.

The Master was positive that no water came aboard on the roll which he so described as unusual. There appears to have been none other like it but this may have been due to the change of course and reduction of speed.

As to the claimed damaged condition of the steel shipment, over and above the overboard loss of the thirteen plates, Captain Wood's testimony was substantially to the effect that he knew of but one steel place bent or dented in the loading of libellant's shipment at Baltimore; no other piece, within his knowledge, was dropped in loading or unloading during the course of the voyage; he did not observe any other plates bent or dented either upon taking on cargo at Baltimore or upon discharging at Seattle; considering that a cargo of paper stowed in the hold was badly damaged by the up-and-down movements of vessel and cargo in

the earthquake of April 15, 1941, the witness was of opinion, said he, that the earthquake agitation could account for dents actually present in the steel plates, claimed to have been found damaged at Nome, Alaska, inasmuch as the lashings of all steel stows were greatly loosened and there followed considerable horizontal and perpendicular movement of the structural steel; but if denting did take place in libellant's shipment, the Master knew not, of course, whether this occurred wholly in the 771 tons stowed on deck, or partly in the same and in the underdeck stow of 281 tons.

Under the most favorable construction that may reasonably be given to all of the evidence bearing on the subject of the steel shipment's condition, it is established that except for one piece, which was damaged in respondent's loading of said shipment from the railroad cars onto the West Kyska, at Baltimore, the cargo left port in good condition, and it may be justly inferred that said one damaged piece was among the thirteen that were lost overboard between San Francisco and Seattle, inasmuch as libelant's witness Watkins, Construction Engineer, on his direct examination swore that he noted its specific identifying marks (No. 131, SSG-1) at Baltimore, at the time that he directed that said damaged piece be loaded as part of the steel cargo, and yet he did not list it, in his compilation of pieces claimed to have been delivered in damaged condition. See Libelant's Exhibit No. 1.

That compilation he made, said he, from the dock slips (covering the damaged pieces) that were handed to him at Nome, Alaska, which is approximately 2288 miles, by sea, beyond the point of discharge by the West Kyska of libelant's shipment from Baltimore, Maryland, to Seattle, Washington. Of the 52 damaged pieces he thus listed, only the 30 carrying the initials L. I. W. (Lancaster Iron Works) ahead of their respective numbers, he testified, formed part of the shipment covered by the bill of lading in this case.

He swore that he witnessed the vessel's discharge of the structural steel cargo at Seattle, and while he claimed to have seen "a few" bends or distortions, he hastened to volunteer the statement "but I did not take any particular note or make a definite note of the number of pieces or where that occurred or take a definite record of it." Asked whether he made a record of the number of pieces "found to be bent upon discharge at Seattle", his answer was "No".

 There is no satisfactory proof before the Court to the effect that the aforementioned 30 pieces of libelant's structural steel were delivered in damaged condition at Seattle. In the absence of such proof, the mere fact that, when the common carrier accepted the shipment at Baltimore for transportation to Seattle, the shipment was in good condition avails libelant nothing; no prima facie case of liability for damaged cargo can be made against the West Kyska, unless and until the damaged condition be established to have existed at the termination of its contract of carriage, evidenced by its bill of lading, upon the shipment's discharge and acceptance at Seattle. Libelant's proof, however, under the most favorable view that may be accorded it, is no more than to the effect that at Nome, Alaska, when delivery was made to it at the end of a second voyage by other common carrier than respondent's West Kyska, thirty pieces of libelant's structural steel shipment which had originated from the Lancaster Iron Works, in Pennsylvania, and had been carried by that vessel from Baltimore to Seattle, were *only then* found to be in damaged condition to the claimed value of approximately one-third of a total damage claim, covering this and another shipment of structural steel, fixed at $2,094.04. See Watkins' deposition, pp. 9, 10.

Libelant has failed to establish by the preponderance of evidence just what was the damaged condition of the 30 pieces of steel at Seattle, if damaged they *then* were, and what was the actual loss that libelant sustained, if any, during the carriage of its goods by sea on the West Kyska and the discharge and delivery thereof at Seattle, port of destination. There can be no recovery, therefore, as to this phase of the case.

 But there is no doubt that libelant should be indemnified for the 13 pieces of structural steel which slipped overboard from the West Kyska, while in transit from San Francisco to Seattle, and representing a money loss of $8,064.18 (Watkins' deposition, p. 16).

While that part of libelant's structural steel shipment as comprised the thirteen lost pieces was stowed on deck at "owner's risk" and under the shipper's specific agreement to bear "all risks of loss * * *

by perils incident to such carriage," and while the Carriage of Goods by Sea Act relieves the carrier and ship from liability for loss or damage to cargo carried which arises or results from "perils, dangers, and accidents of the sea, * * *", 46 U.S.C.A. § 1304(2) (c), it is nevertheless clear that, under the hereinabove detailed circumstances attending the partial loss·of cargo, recovery may and should be had by libelant.

The respondent carrier, under said Carriage of Goods by Sea Act, was under the legal obligation to "properly and carefully * * * stow, carry, keep, care for, and discharge the goods carried," 46 U.S.C.A. § 1303(2), and it appears that respondent negligently failed to comply therewith.

Libelant having proved that the West Kyska contracted to carry said 13 pieces from Baltimore to Seattle and that it sustained loss by reason of non-delivery at the discharge port, the burden thereafter rested on respondent to prove that such loss and damage was excepted from its liability as common carrier under the law or by the terms of the contract of carriage evidenced by the bill of lading;—in other words, that the loss was solely caused by a peril, danger, and accident of the sea, or by a peril incident to on-deck carriage, without contributing negligence on its part. Clark v. Barnwell, 1851, 12 How. 272, 13 L.Ed. 985.

Even were it conceded that the loss overboard proximately resulted either from an excepted peril or from the carrier's negligence in caring for the cargo, the burden would still be respondent's to show its freedom from negligence. The Niagara v. Cordes, 1858, 21 How. 7, 62 U.S. 7, 16 L.Ed. 41; The Vallescura, 1934, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373.

The sea and weather conditions encountered by the West Kyska on the San Francisco-Seattle leg of its voyage were never such as to justify respondent's contention that it was solely because of an excepted peril that the 13 pieces of structural steel were lost overboard. The Lady Drake, 1935 A.M.C. 427, 434–436; Id., 1936 A.M.C. 998; Id. 1937 A.M.C. 290, 292; Weil v. American-West African Lines, Inc., (The West Kebar) 2 Cir., 147 F.2d 363, 1945 A.M.C. 191, 195, 196.

In view of Captain Wood's testimony, hereinabove detailed, with respect to the West Kyska's sudden righting from a "very severe roll to port," respondent places great reliance upon the case of Automobile Ins. Co. of Hartford, Conn. v. Hart-Wood Lumber Co. et al. (The San Diego), 9 Cir., 1939, 105 F.2d 387. In that case, while the San Diego was on her way off the coast of Oregon, on August 13, 1935, with the wind blowing 25 to 31 miles an hour and the waves running about 10 to 12 feet high, as was not unusual for the season and location, she was struck by one big wave, absolutely different from all others, which partly filled the vessel with water, "causing her to list to starboard by reason of the weight of water taken aboard." This unexpected and unusual occurrence caused a shift to starboard of the vessel's lumber cargo, carried on deck, and the weight of the cargo in displaced position sundered the lashings securing the lumber, a part of which, upon being so freed, slipped over the vessel's side into the sea. The lumber cargo, so the evidence further showed, had been secured "in the usual fashion with chain lashings and turnbuckles which had been set up before the ship left the dock and which were tightened from time to time as they were loosened by the working of the deckload in the seaway."

The appellant contended that no peril of the sea was encountered and that the partial loss of cargo was due to unseaworthiness of vessel occasioned by claimed negligent stowage of the lumber cargo and the failure to take ship stability tests before the San Diego left port.

The testimony was to the effect that the usual stability tests were actually taken before sailing and the Court of Appeals concluded, as reads the Court opinion, "that the affirmative evidence justified the finding of the trial court that the ship was seaworthy, the deckload was properly stowed and secured, that the ship was properly manned, that there was no negligence, and that the loss of the deck cargo was caused by a peril of the sea either by an unusual and unexpectedly large wave, or by an unusual and unexpected roll of the ship into the wave due to an unusual and unexpected combination of circumstances, causing a list of the vessel and the carrying away of the deck lashings and the loss of the cargo."

It is patent that the circumstances attending the West Kyska's loss of libelant's 13 pieces of structural steel were far different than those which led to the finding that the San Diego's partial loss of cargo resulted from a peril of the sea.

In view of the foregoing considerations, and to relieve the parties from the necessity

520

of complying with the local Admiralty Court Rule 12, so that delay may be obviated, the Court does now make these following findings of fact and conclusions of law, viz.:

### Findings of Fact.

1. None of libelant's structural steel shipment was proved to have been discharged in damaged condition by the common carrier, the SS West Kyska, at Seattle, Washington, the port of destination of the voyage from Baltimore, Maryland, with reference to which respondent issued its bill of lading No. 11 of March 25, 1941.

2. The No. 1 hatch deck stow of a portion of said shipment on said vessel was improperly made and inadequately secured.

3. Such faulty and insecure condition of stowage was the sole proximate cause of the loss overboard of libelant's thirteen (13) pieces of structural steel on May 3, 1941.

4. No peril of the sea, nor peril incident to on-deck stowage, was present and responsible for such loss.

5. The loss actually sustained by libelant, as the proximate result of the breaking up of said No. 1 hatch stow and the slipping overboard of the topmost part thereof, or said thirteen pieces, amounted to the sum of $8,064.18.

6. The necessary replacement of the lost 13 pieces cost libelant the said sum of $8,064.18, which it paid on June 9, 1941.

### Conclusions of Law.

1. Libelant is not entitled to recover from respondent for claimed delivery in damaged condition of a part of the shipment covered by respondent's bill of lading No. 11, of March 25, 1941.

2. Libelant is, however, entitled to recover from respondent the sum of $8,064.18, with interest at the rate of five (5%) per cent. per annum, until paid, as damages sustained by it in being put to the necessity of making replacement of thirteen (13) pieces of structural steel, lost overboard from respondent's SS West Kyska by reason of the carrier's negligence in failing to properly and carefully stow, carry, keep and care for the same.

3. Said interest should be computed from the moment of the loss, or that is to say, from June 9, 1941, upon which date libelant disbursed said principal sum of $8,064.18 as necessary cost of replacement.

Accordingly, the appropriate decree will be signed on presentation.